Argued April 13, affirmed May 18, 1960

IN THE MATTER OF THE ESTATE OF
ADAM B. WARPOUSKE, DECEASED
STATE LAND BOARD *v.* UNITED STATES
352 P. 2d 539

*Alan S. Rosenthal,* Washington, D. C., argued the cause for appellant. With him on the brief were George Cochran Doub, Assistant Attorney General, Washington, D. C., C. E. Luckey, United States Attorney, Portland, and Robert Wang, Washington, D. C.

*Catherine Zorn,* Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief was Robert Y. Thornton, Attorney General, Salem.

Before McALLISTER, Chief Justice and WARNER, O'CONNELL and DUNCAN, Justices.

WARNER, J.

This is an appeal by the United States from a decree of the circuit court for Multnomah county,

department of probate, escheating to the state of Oregon for the benefit of the common school fund that portion of the estate of Adam B. Warpouske received by him from the estate of his deceased brother. The United States claims said fund pursuant to a federal act hereinafter referred to, in its capacity as trustee, for the sole use and benefit of the General Post Fund, a trust created by that act.

The federal government's position here is predicated solely upon the provisions of 38 USCA §§ 17-17j, hereinafter referred to as the "Act of 1941." The pertinent sections read:

> "§ 17. Vesting of undisposed personalty in United States as trustee for General Post Fund
>
> "Effective ninety days after December 26, 1941, whenever any veteran (admitted as a veteran) shall die while a member or patient in any facility, or any hospital while being furnished care or treatment therein by the Veterans' Administration, and shall not leave surviving him any spouse, next of kin, or heirs entitled, under the laws of his domicile, to his personal property as to which he dies intestate, all such property, including money and choses in action, owned by said decedent at the time of death and not disposed of by will or otherwise, shall immediately vest in and become the property of the United States as trustee for the sole use and benefit of the General Post Fund, a trust fund prescribed by section 725s (b) (45) of Title 31.
>
> "The foregoing provisions are conditions precedent to the initial, and also to the further furnishing of care or treatment by the Veterans' Administration in a facility or hospital. The acceptance of care or treatment by any veteran admitted as such to any Veterans' Administration facility or hospital after ninety days from December 26, 1941, and as well the continued acceptance of care or

treatment furnished by the Veterans' Administration after said ninety days by any veteran who is then receiving the same shall constitute an acceptance of the provisions and conditions of this subchapter and have the effect of an assignment, effective at his death, of such assets in accordance with and subject to the terms and provisions of this subchapter and the regulations issued in accordance with and pursuant thereto.    *    *    *

"§ 17a. Presumption from death in facility of contract for disposition of property

"The fact of death of the veteran (admitted as such) in a facility or hospital, while being furnished care or treatment therein by the Veterans' Administration, leaving no spouse, next of kin, or heirs, shall give rise to a conclusive presumption of a valid contract for the disposition in accordance with this subchapter, but subject to its conditions, of all property described in section 17 of this title owned by said decedent at death and as to which he dies intestate.    *    *    *  .

*    *    *    *    *

"§ 17g. Notice to veterans of law

"The Administrator of Veterans' Affairs shall prescribe a form of application for hospital treatment and domiciliary care which shall include notice of the provisions of this subchapter. Within ninety days after approval hereof similar notice shall be given to each veteran then receiving care in any facility or hospital as described in this subchapter: *Provided, however,* That this requirement shall be met by posting of said notice with a copy of the prescribed form in a prominent place in each building wherein patients or members are housed. *    *    *"

The foregoing act was preceded by the Act of June 25, 1910, c 384, which was amended by Act of December 26, 1941, c 634, thus giving it its present

form. In discussing certain decisions which follow, we will refer to the earlier version as the Act of 1910.

The facts are not in dispute. On December 31, 1955, Warpouske, a veteran of World War I, was admitted to Good Samaritan Hospital, in Portland, Oregon, for treatment of a hip fracture and cerebral hemorrhage. Five days later, he was moved to the Multnomah County Hospital for treatment at the expense of the county. There he remained until March 1, 1956, when he was transferred to the U. S. Veterans Hospital, Marquam Hill, Portland, Oregon.

While in the county hospital, his mental condition varied from comatose to semi-comatose and he was at all times lethargic and mentally confused. The testimony of one of the doctors of the county hospital was to the effect that Warpouske probably did not know where he was and in all probability did not even know he had been transferred. Indeed, the United States concedes that on March 1, 1956, by reason of his serious mental condition, he could not handle his own affairs. It also produced records of the Veterans Administration showing, as early as 1924, a long history of mental deficiency predating his last illness beginning in December, 1955. A diagnosis made by that facility in 1933 revealed a condition of dementia praecox as early as 1924, and concluded he was insane as of that date and probably before.

His treatment at the Veterans Hospital from the date of his entry, March 1, 1956, to the date of his death, March 19, 1956, reflects no change in his physical or mental condition. There is no evidence of or suggestion by the United States that the decedent during that period was even momentarily mentally competent to negotiate a contract or make a testamentary disposition of his property.

Dying as he did intestate and without known heirs, his estate will escheat to the state of Oregon unless it appears that the federal government has a superior right thereto under the sections of the Congressional Act of 1941, supra.

There is no record indicating who made the decisión for the transfer. Certainly, the veteran had no capacity to do so nor did he then have a guardian or relatives to act in his behalf. His presence in the Veterans Hospital can only be said to have been an involuntary admission, even though there was no question as to his right to be there by reason of his disabilities and war service status.

On March 9, 1956, the Portland Trust Bank was appointed guardian of Warpouske's estate for the purpose of receiving an inheritance from the estate of a brother who predeceased him in Wisconsin. This was in the net amount of $12,727.67. In addition thereto, he had when he died an item of personal property of the value of $28 and unexpended veterans pension benefits in the amount of $1,134.25. No contest exists between the parties as to the government's right to receive the last amount as rightly accruing to it under 38 USCA § 450(3) of the Act of 1930.

Out of the foregoing statement we cull these significant admitted facts which bear heavily in the formulation of our final judgment: Warpouske, long before determined insane, was totally mentally incompetent when he was involuntarily delivered to the Veterans Hospital on March 1, 1956; and that then and thereafter until the date of his death he was incompetent to contract or to make a will, and neither knew where he was or that he had been the recipient of a substantial inheritance.

■ Contrary to the argument advanced by the gov-

ernment, we are of the opinion that when we take the Act of 1941 by its four corners it sounds in contract. It is designed to effect a contractual relationship between the veteran patient and the United States. This is emphasized by words and phrases appearing in its several sections. Thus, we find "The *acceptance* of care or treatment \* \* \* shall constitute an *acceptance* of the provisions and conditions of this subchapter and have the effect of an *assignment*" (Sec 17 of Act); "The fact of death \* \* \* shall give rise to a conclusive presumption of a valid *contract*." (Sec 17a of Act) We note, too, that Sec 17g directs "a form of application for hospital treatment and domiciliary care which shall include a *notice* of the provisions of this subchapter." (Emphasis supplied.)

Appellant's principal assertion of error is: that the court erred "because [it held that] he [the decedent] had not entered into *a valid contract* with the United States providing for such disposition [of his estate] upon his death." (Emphasis supplied.)

The contractual character of the Act of 1941 has been consistently recognized and applied by the federal courts, as demonstrated by the following cases: *U. S. v. Gallagher,* 97 F Sup 1014, 1015 (SD Cal 1951); *U. S. v. Brown,* 110 F Sup 370, 372 (SD Cal 1952); *U. S. v. Peoples Nat. Bank of Chicago,* 121 F Sup 331, 332 (ND Ill 1953); *U. S. v. The Mid City Nat. Bank of Chicago,* 121 F Sup 402, 403 (ND Ill 1953); *U. S. v. Security-First Nat. Bank of Los Angeles,* 130 F Sup 521, 522 (SD Cal 1955); *U. S. v. Stevens,* 302 US 623, 82 L ed 484, 58 S Ct 388 (1938). It was also so construed in the following state cases: *In re Witte's Estate,* 174 Kan 360, 255 P2d 1039, 1042 (1953); *In re Turner's Estate,* 171 Cal Ap2d 591, 341 P2d 376, 379'

(1959). All of the cases cited in this paragraph, except *U. S. v. Stevens,* construed the Act of 1941 as it is presently relied upon by the government.

It would appear from the Act of 1941, as well as by judicial declarations made in construing it, that the Congress acted with its usual respect for the Constitution and deliberately adopted the contractual concept in order to avoid trespassing upon an area reserved to the states by the Tenth Amendment; that is, the right to legislate concerning the devolution of property of intestates, including the right to declare escheats.

This conclusion is given recognition in *U. S. v. Stevens,* supra (82 L ed at 488), and in *U. S. v. Security-First Nat. Bank of Los Angeles,* supra (130 F Sup at 523).

■ The Act of 1941, being, as it is, a species of statutory contract, is governed by the ordinary rules relating to actions on contract. *Foley v. Leisy Brewing Co.,* 116 Iowa 176, 89 NW 230, 231.

■■ It is a principle universally recognized that only the mentally competent can enter into a binding contractual engagement and so, too, the further rule that silence and inaction do not amount to an acceptance of an offer. *Dexter v. Hall,* 82 US 20, 21 L ed 73, 77; *Beach v. U. S.,* 226 US 243, 57 L ed 205, 33 S Ct 20. These declarations of the law form a part of our own jurisprudence. See *Farley v. Parker* (1876), 6 Or 105, 111; *Bowman v. Wade* (1909), 54 Or 347, 357, 103 P 72; and *Graham v. Allen* (1925), 116 Or 501, 505, 241 P 1007, wherein it was held that an instrument signed by one non compos mentis at the time of its execution is *void.* See, also, *German Savings & Loan Soc. v. DeLashmutt,* 67 F 399 (CC D Or 1895), following *Dexter v. Hall,* supra; *Edwards v. Davenport,* 20 F 756 (CC SD Iowa 1883), and *Farley v.*

*Parker,* supra. Infants and the mentally incompetent both command the protection of courts of law, as well as courts of equity. *Dexter v. Hall,* supra (21 L. ed at 77).

In coming to his conclusion in *U. S. v. Stevens,* supra, that a valid contractual relationship subsisted between the veteran and the government, we find what we deem a significant statement in the light of the facts prevailing in this matter. There, Mr. Justice Black observed: "Nothing in the record indicates that the agreement was not fairly and voluntarily entered into between the parties, or that it was inequitable, unjust or not upon valuable consideration. *Both parties were competent to make the contract.*" (302 US at 628; 82 L ed at 488) (Emphasis supplied.)

Crowded to avoid the law's solicitude for the incompetent in the area of contract, appellant attempts to sidestep it by recourse to that part of Sec 17a of the Act of 1941, reading: "The fact of death of the veteran (admitted as such) in a facility or hospital, * * * leaving no spouse, next of kin, or heirs, shall give rise to *a conclusive presumption of a valid contract.*" (Emphasis supplied.) In support of this position, appellant advances the argument: "This provision is wholly inconsistent with the view of the court below that Congress intended to require an actual contract between the veteran and the federal government." If by "actual" appellant means only express contracts and not contracts so forcibly implied by the statutory conclusion, then it flies in the face of the consistent line of federal holdings, as pointed out above, that both the Act of 1910 and its successor, the Act of 1941, are premised upon a theory of contractual relationship.

Assuming without deciding that between the government and veterans who are sui juris the Congress can create a valid contractual relationship by the employment of the conclusive presumption, we are still confronted with the question as to whether such a presumption can be effectively and constitutionally applied against a concededly incompetent veteran. In short, can a legislative body defy common experience and by resort to fiat convert the irrational into the rational, transform the unnatural into the natural? Has Congress the power by the adoption of the device of an absolute presumption to create a "valid" engagement out of one made by an incompetent person, which without doubt would otherwise be declared to be a nullity by the courts?

■■ Presumptions, whether conclusive or disputable, are generally defined as inferences *required* by a rule of law to be drawn as to the existence of one fact from the existence of some other established basic fact. They may be created by statute if there is some justification of public policy, or a rational connection between the fact proved and the fact presumed. But statutes declaring certain facts to be even prima facie or rebuttable evidence of other facts can violate constitutional guaranties of due process where there is no rational connection between the facts proved and the ultimate fact presumed. *Tot v. U. S.*, 319 US 463, 87 L ed 1519, 63 S Ct 1241 (1943); *McFarland v. American Sugar Ref. Co.*, 241 US 79, 60 L ed 899, 36 S Ct 498; *Manley v. Georgia*, 279 US 1, 6, 73 L ed 575, 578, 49 S Ct 215; *Morrison v. California*, 291 US 82, 91, 78 L ed 64, 54 S Ct 281; *Great Atlantic & Pacific Tea Co. v. Ervin*, 23 F Sup 70, 80 (DC Minn 1938); *U. S. v. Jones*, 176 F2d 278 (9th Cir 1949); 1 Jones, Evidence (5th ed), 23-24, § 12; IV Wigmore,

Evidence, 715, § 1353; Anno 162 ALR 495; 16A CJS 817, Constitutional Law § 621, n 74; 20 Am Jur 39-41, Evidence §§ 9, 10; 10 Tex Law Rev 34 (1931-32); *City of Seattle v. Ross,* 54 Wash 2d 655, 344 P2d 216, 219 (1959).

Mr. Justice Holmes in *McFarland v. American Sugar Ref. Co.,* supra, observes:

"As to the presumptions, of course the legislature may go a good way in raising one or in changing the burden of proof, but there are limits. It is 'essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate.' * * *." (241 US at 86)

Perhaps the clearest and best enunciated statement of the test of national connection is found in that made by Mr. Justice Roberts in *Tot v. U. S.,* supra (87 L ed at 1524):

"* * * Under our decisions, a statutory presumption cannot be sustained if there be no rational connection between the fact proved and the ultimate fact presumed, if the inference of the one from proof of the other is arbitrary because of lack of connection between the two in common experience. This is not to say that a valid presumption may not be created upon a view of relation broader than that a jury might take in a specific case. But where the inference is so strained as not to have a reasonable relation to the circumstances of life as we know them it is not competent for the legislature to create it as a rule governing the procedure of courts."

■■ Although this court has never been faced with a problem of the character now presented, our adherence to these principles has implicit support, as re-

flected by *Wyckoff v. Mutual Life Ins. Co.,* 173 Or 592, 608, 147 P2d 227, where we cited with approval and with the emphasis there indicated the following statement from 20 Am Jur 40, Evidence § 9:

"* * * Statutes declaring certain facts to be prima facie or presumptive evidence of other facts do not, *where there is some rational connection between the facts proved and the ultimate facts presumed,* deny equal protection of the laws or violate constitutional guaranties of due process of law. * * *"

See, also, our holding in *Burke v. Burke,* 216 Or 691, 697, 340 P2d 948, where Mr. Justice MILLARD, in discussing the presumption of a child's legitimacy by reason of being born in wedlock (ORS 41.360(3) and 109.070), observes: "* * * the modern trend is away from the rule of conclusiveness. 57 ALR2d 759," and cites with approval the following statement from *Anderson v. Anderson,* 214 Cal 414, 5 P2d 881, 882: "It [a presumption] cannot prevail as against undisputed facts to the contrary and at variance with the laws of nature." Although discussing the Burke case presumption of legitimacy, we are of the opinion that the statements quoted are equally forceful when the making of "valid contract" is conclusively presumed to have been accomplished by one non compos mentis while a thrall to his mental disability.

What is true of rebuttable presumptions has even more cogency with respect to conclusive presumptions which operate to deprive individuals of their rights or infringe upon constitutionally protected areas. *Heiner v. Donnan,* 285 US 312, 76 L ed 772, 52 S Ct 358 (1932); *Schlesinger v. Wisconsin,* 270 US 230, 70 L ed 557, 46 S Ct 260, 43 ALR 1224; *City of New Port Richey v. Fidelity & Deposit Co. of Maryland,*

105 F2d 348 (5th Cir 1939), 123 ALR 1352; *Comm'r of Internal Revenue v. Clark,* 202 F2d 94 (7th Cir 1953). See, also, 12 Am Jur 317-18, Constitutional Law § 625.

In *Heiner v. Donnan,* supra, the court dealt with a provision of the Internal Revenue Code which made transfer of a gift two years prior to death conclusively presumed to be made in contemplation of death. It was held that the presumption violated the prohibition of the Fifth Amendment against the taking of property without due process of law and the presumption was characterized by Mr. Justice Sutherland as follows:

> "* * * whether the * * * presumption be treated as a rule of evidence or of substantive law, it constitutes an attempt, by legislative fiat, to enact into existence a fact which here does not, and cannot be made to, exist in actuality, * * *." (76 L ed at 780)

■ All parties concede the extreme degree of the mental incompetency of the deceased veteran; yet, the government's only claim to his property (in this instance, *not unexpended funds received from United States pensions,* but an inheritance received from his brother) rests solely upon a conclusive presumption that his presence in the hospital at death resulted in a "valid contract for the disposition * * * of all property * * * owned by [the] decedent" at the time of his death.

We find in the situation presented by Warpouske's history and the employment of the presumption relied upon by appellant, a striking exemplification of an irrational and unnatural relationship between the proven fact of his death in a government hospital as an incompetent and the ultimate fact presumed. It

is one having all the elements which have prompted courts to deplore such a mandate as an arbitrary and unreal artifice, contravening the Due Process Clauses of the Fifth and Fourteenth Amendments. In this matter, when applied to Warpouske and other unfortunates of the same category, it is, as said by Mr. Justice Sutherland in *Heiner v. Donnan,* supra, "an attempt, by legislative fiat, to enact into existence a fact which here does not, and cannot be made to, exist in actuality."

The presumption here excludes consideration of all the circumstances which brought Warpouske to the hospital and made him an involuntary patient there from the time of his entry until the day of his death. We are now asked to presume, however, that a man totally non compos mentis voluntarily accepted the benefits the hospital bestowed (and to which he was entitled under the law, without charge) and who, because of his failure to make a testamentary disposition of his estate while in the hospital, and to further presume that by his enforced silence he waived his right so to do in favor of the government. The death of the veteran in the hospital, although helpless and there without his direction or knowledge is thus made the sole factor which activates the absolute presumption that he made "a valid contract for the disposition" of his property to the United States (Secs. 17, 17a) and which, if applied, forecloses any opportunity to present evidence that the veteran was wanting in mental capacity either then or for years before, to make any kind of a valid contract or will.

That the creation of this contract with Warpouske might well be a proper subject for judicial inquiry despite the conclusive presumption written into the Act of 1941 is strongly indicated by Judge Tolin in

*U. S. v. Security-First Nat. Bank of Los Angeles,* supra (130 F Sup 521), by his observation at page 522, reading:

> "No party has challenged the validity of this agreement on the ground that there was no agreement as to the footnoted matter, and although a footnote to an application for admission to a hospital is not an exemplary way to establish privity of contract, in the absence of challenge, it is sufficient. Considering that applicants for domiciliary care in a hospital are usually sick and often lacking acute mental perception, the force of a footnote to the entry application (the footnote purporting to create a special contract of unusual character) might be considerably diminished, and frequently destroyed by a careful inquiry into the circumstances of the execution of the application for domiciliary care.  *  *  *  That contracts of this character may be valid if properly entered into, is firmly established by Supreme Court adjudication."

We do not think the Congress ever intended to apply the presumption found in the Act of 1941 to a situation akin to what we find here, for to thus appropriate the property of the estate of an utterly helpless veteran by the arbitrary device of "conclusive presumption" is basically contrary to the traditional solicitude of the government for its disabled war veterans.

There is an even more cogent reason for assuming that the position taken by appellant's counsel is not consonant with Congressional intent. To conclude this matter in favor of the government by approving its claim to Warpouske's inherited money solely because of the conclusive presumption it invokes, would, in fact, transform the status of the government claim in the instant matter to one closely approaching the

exercise of an arbitrary right of escheat, rather than upon a claim of right derived from contract.

We have no doubt that one of the motivations for the legislative design upon which the Act of 1941 is predicated, in terms of contract, was the Congressional consciousness of its want of constitutional power to exercise a right of escheat in an estate, knowing full well that all matters concerning the devolution of property are reserved by the Tenth Amendment to the several states. *Mager v. Grima,* 49 US 490, 493, 12 L ed 1168; *Pennoyer v. Neff,* 95 US 714, 722, 24 L ed 565; *U. S. v. Fox,* 94 US 315, 320, 24 L ed 192; *U. S. v. Perkins,* 163 US 625, 628, 41 L ed 287, 16 S Ct 1073. See, also, *U. S. v. Security-First Nat. Bank of Los Angeles,* supra (130 F Sup at 523).

Notwithstanding the multiple holdings of the federal courts that the Act of 1941 envisions a contractual relationship, counsel for appellant would have us believe the contrary and to do so places reliance upon the decisions of state courts.

But before we give critical attention to the several cases which appellant's counsel urges upon us, it is important that we take notice of the two separate and distinct acts under which the government can lay claim to the estates of veterans dying intestate in a government facility without heirs surviving them.

The first, in the order of their enactment, was § 450(3), 38 USCA. This subsection was added to § 450, supra, by Act of July 3, 1930, and we will refer to it as the Act of 1930. The other is the Act of 1941, under which the federal government lays its claim against the estate of Warpouske.

Both Acts rely upon two different theories of right as a basis for the governmental claim of ownership and each reaches an entirely different species of prop-

erty in the veteran's estate. Moreover, the property recovered under the Act of 1930 goes into an entirely different fund than that obtained under the Act of 1941.

The Act of 1930 implements a recoupment of any unused or accrued funds derived from federal pensions or other forms of veteran gratuity, whereas, the Act of 1941 is designed to place in the government's reach any other personal property of the veteran no matter from whence derived. Hence, we have here the relinquishment to the government without contest the sum of $1,134.25, earlier referred to as being funds representing unexpended pension benefits. This was correctly done pursuant to the Act of 1930. But as to the balance of decedent's estate, represented solely by the inheritance received from his brother, appellant claims ownership, not under the Act of 1930, but under the Act of 1941, on the theory of a conclusive contract.

No element of contract is present or required under the earlier Act of 1930, as is evident from a reading of the pertinent part of Sec 450(3):

"* * * That any funds in the hands of a guardian, curator, conservator, or person legally vested with the care of the beneficiary or his estate, derived from compensation, automatic or term insurance, emergency officers' retirement pay, or pension, payable under said Acts, which under the law of the State wherein the beneficiary had his last legal residence would escheat to the State, shall escheat to the United States and shall be returned by such guardian, * * * to the Veterans' Administration, and shall be deposited to the credit of the current appropriations provided for payment of compensation, insurance or pension."

The obvious intent, purpose and meaning of the foregoing section of the Act of 1930 is that the federal

government has not made the gift of a pension or other gratuity absolute and complete, but has retained in itself at all times a contingent reversionary interest, which under the circumstances stipulated in Sec 450(3), would vest the residue of the gift in the government to the exclusion of any claim of escheat by the state. *In re Lindquist's Estate,* 25 Cal2d 697, 154 P2d 879 (1944). No claim of contract is involved. The right to the continuing interest of the government to the unused portions of such gratuities attaches from the date of the initial disbursement of its bounty. See *Abbott v. Morgenthau,* 68 App DC 83, 93 F2d 242.

Unfortunately, all courts have not observed this clear and important distinction between what the government can properly claim under the Act of 1941 and can properly obtain under the Act of 1930, nor have they noted the difference in the basic theories around which each of said Acts is separately built. This is found to be particularly true when one examines the decisions of the state courts, and is exemplified by the cases cited to us by appellant. To the extent that they do not adjudicate claims made to property under the Act of 1941, but are rather addressed to the recovery of the kind of property specified in the Act of 1930, they may be laid aside.

With these matters in mind, we now turn to a consideration of the cases which appellant has marshaled.

*In re Gonsky's Estate,* 79 ND 123 55 NW2d 60 (1952), the estate "consisted of United States savings bonds and cash all derived from payments to him [Gonsky] during his lifetime by the United States as retirement for disability as a regular army person." (55 NW2d, supra, at 61).

*In re Skriziszouski's Estate,* 382 Pa 634, 116 A2d

841 (1955), again, we find that the decedent's estate amounting to $21,905, "was composed of money received from the Federal Government through the Veterans' Administration, plus interest earned thereon," except for $50 received as a bonus from the Commonwealth of Pennsylvania (116 A2d, supra, at 842).

The same situation as to the character of the estate left by decedent prevailed *In re Campbell's Estate,* 195 Misc 520, 89 NYS2d 310 (1949), where the surrogate court observes, at p 311: "His [Campbell's] estate consists of assets derived solely from pensions paid to the decedent through his committees by the United States Government." So, too, in the *Matter of the Estate of Alexander Zakowski* (1950) (an unreported opinion of the Circuit Court for Wayne County, Michigan, copy of which is incorporated in appellant's brief by the appendix).

Thus, in every state case to which we make reference in the preceding paragraphs, the government's reversionary right to recovery of unused bounties is made clear by the provisions of the Act of 1930 and is the explanation for those decisions. Here, however, the government reaches not for the residue of pension funds, but for property which came to Warpouske by inheritance. Obviously, the foregoing cases do not speak to the contractual aspect of a claim arising under the Act of 1941, nor, for the same reason, do they discuss or refer to the conclusive presumption clause of the Act of 1941 upon which appellant rests its case. The only element common to the last-mentioned cases and the one at bar is that the decedents were mentally incompetent, a factor which in no way militates against the government's reserved right to effect a recovery under the Act of 1930.

Appellant also points to *In re Bonner's Estate,* 192 Misc 753, 80 NYS2d 122 (1948), a decision of the surrogate court of New York, but never appealed. We have reserved comment on that case because it more nearly proximates the factual situation disclosed by the record in the case at bar. The decedent, Bonner, was an adjudicated incompetent and an inmate of veterans hospitals continuously from 1922 until his death in 1944. He left assets consisting of Adjusted Service Bonds of the value of $1,550 and other assets worth $3,350.21 from an undisclosed source and in the opinion referred to as the "distributable balance," and, therefore, in the property aspect similar to Warpouske's estate. The court rests its conclusion favorable to the government upon both the Act of 1930 and the Act of 1941.

A too casual reading of the decision might warrant a conclusion that it supports the government's position in this appeal. But critical analysis nullifies its value here. As to the service bonds, a form of governmental gratuity, the court ruled correctly.

Concerning the rest of the estate, i.e., the "distributable balance," which came to Bonner from other than governmental sources, the court makes this arresting and palpably incorrect statement at p 126:

> "* * * Apart from the Adjusted Service Bonds which were paid to decedent as additional compensation for his service in World War I, it is not claimed that the distributable balance herein consists of the residue of governmental gifts. *This fact, however, is not controlling.* * * *"" (Emphasis supplied.),

citing as its sole authority *Matter of McGhee,* 149 Misc 713, 268 NYS 79 (1932), aff'd 239 App Div 763, 264 NYS 903, aff'd 262 NY 686, 188 NE 121.

But McGhee fails to support such a sweeping con-clusion. A reading of McGhee discloses two interesting and distinguishing differences from the Bonner case and the present appeal. McGhee, a veteran of the Civil War, was a resident of the National Military Home at Bath, New York. When he entered that facility in 1929, he executed a written application which was, in fact, a contract leaving to the government the proceeds of his estate not disposed of by will and embodying the terms of what was then Sec 136 of 24 USCA. That Act was the predecessor to the present Act of 1941. The claim of the government, rightly adjudicated in its favor, rested solely on a written agreement as then required by the Act as a condition to his entry. McGhee died intestate and without heirs. No issue was raised concerning his mental capacity to make such a contract, nor does the decision suggest that he was at any time incompetent.

We find nothing in the cases cited to us by appellant which is decisive here and for the reasons previously stated, hold that the Act of 1941 is inoperative when applied to the estate of Adam B. Warpouske.

Affirmed.