UNITED STATES, TRUSTEE, *v.* OREGON.

No. 329.    Argued April 25, 1961.—Decided May 29, 1961.

*Herbert E. Morris* argued the cause for the United States.   With him on the briefs were former *Solicitor General Rankin, Solicitor General Cox, Assistant Attorney General Orrick, Acting Assistant Attorney General Leonard, Alan S. Rosenthal* and *David L. Rose.*

*Catherine Zorn,* Assistant Attorney General of Oregon, argued the cause for respondent.   With her on the brief was *Robert Y. Thornton,* Attorney General.

MR. JUSTICE BLACK delivered the opinion of the Court.

Adam Warpouske, an Oregon resident, died in a United States Veterans' Administration Hospital in Oregon without a will or legal heirs, leaving a net estate composed of personal property worth about $13,000.   Oregon law pro-

vides that such property shall escheat to the State.[1]   A United States statute, on the other hand, provides that when a veteran dies without a will or legal heirs in a veterans' hospital, his personal property "shall immediately vest in and become the property of the United States as trustee for the sole use and benefit of the General Post Fund . . . ."[2]   In reliance upon these provisions of their respective statutes, both the State of Oregon and the Government of the United States filed claims for Warpouske's estate in the Oregon probate court having jurisdiction of the matter.

Recognizing that the federal statute, if applicable and valid, would make the claim of the United States paramount, the State attacked the Government's reliance upon that statute on two grounds: first, it urged that the federal statute did not apply to this case on the theory that its provisions depended upon the Government's having made a valid contract with the veteran prior to his death and that Warpouske had made no such contract because he had been mentally incompetent to do so when he entered the hospital and at all times thereafter up to his death; and, secondly, it urged that the federal statute, even if applicable, was invalid because it pertains to the devolution of property, a matter contended to have been wholly reserved to the States by the Tenth Amendment.

After hearings, the probate court found as a fact that Warpouske had been unable to enter into a valid contract with the Government because of his mental

---

[1] Ore. Rev. Stat., § 120.010, provides: "Immediately upon the death of any person who dies intestate without heirs, leaving any real, personal or mixed property, interest or estate in this state, the same escheats to and vests in the state, subject only to the claims of the creditors and as provided in ORS 120.060 to 120.130; and the clear proceeds derived therefrom shall be paid into and become a part of the Common School Fund of this state and be loaned or invested by the State Land Board, as provided by law."

[2] 38 U. S. C. (1952 ed.) § 17.

incompetence. That court then accepted the State's interpretation of the federal statute as requiring a valid contract as a prerequisite to its application and concluded that since such a contract could not, in this case, have been made, the State was entitled to Warpouske's property by virtue of its escheat law. On appeal, the State Supreme Court affirmed on the same grounds.[3] Because of the importance of this question of federal statutory construction and an alleged conflict between this decision and decisions previously made by other state courts of final jurisdiction,[4] we granted certiorari.[5]

Since we accept the findings of the two state courts that Warpouske could not and did not enter into a contract to leave his property to the United States, the crucial question is whether the Government can prevail in the absence of such a contract. We hold that it can on the grounds that the federal statute relied upon does not require a contract and that this statute does not violate the Tenth Amendment.

The controlling provision was passed in 1941 as an amendment to the Sundry Appropriations Act of 1910.[6] The 1910 Act quite plainly and unequivocally provided that the admission of an applicant to a veterans' home should "be and constitute a valid and binding contract between such applicant and the Board of Managers of said home that on the death of said applicant while a member of such home, leaving no heirs at law nor next of kin, all personal property owned by said applicant at the time of his death, including money or choses in action held by him and not disposed of by will . . . shall vest in

---

[3] 222 Ore. 40, 352 P. 2d 539.

[4] The conflict alleged is with the decisions in *Skriziszouski Estate,* 382 Pa. 634, 116 A. 2d 841; and *In re Gonsky's Estate,* 79 N. D. 123, 55 N. W. 2d 60.

[5] 364 U. S. 877.

[6] 36 Stat. 703, 736

and become the property of the said Board of Managers for the sole use and benefit of the post fund of said home . . . ." The contractual nature of these provisions of the 1910 Act was clear and, indeed, we expressly recognized that fact when the question of the validity of the Act was brought before this Court.[7]

The 1910 Act was greatly amplified, however, by the amendments adopted in 1941 [8] and the central provision of the Act, quoted above, was significantly changed. Section 1 of the new Act restates this provision without reference to the word "contract," providing simply that when a veteran dies "while a member or patient in any facility, or any hospital while being furnished care or treatment," all his personal property "not disposed of by will or otherwise, shall immediately vest in and become the property of the United States as trustee for the sole use and benefit of the General Post Fund . . . ." [9] The Act then goes on to supplement this basic provision with other provisions that are drawn in the language of contract. But these provisions must be read in the context of § 2 of the Act which provides that the death of a veteran in a veterans' hospital "shall give rise to a conclusive presumption of a valid contract." [10] Read in this context, the language of contract which appears in these other provisions of the Act is not at all inconsistent with the provision for automatic vesting without a contract in § 1. Quite the contrary, it seems plain to us that

---

[7] "In passing the Act of June, 1910, Congress merely directed the terms and conditions under which veterans, consistently with state law, can obtain admittance to Homes built, maintained and operated by the government for the benefit of veterans. Homes for the aged, needy, or infirm, in return for the benefits bestowed by them, generally receive some benefit from any property or estates of their members." *United States* v. *Stevens,* 302 U. S. 623, 627.

[8] 55 Stat. 868, 38 U. S. C. (1952 ed.) § 17 *et seq.*

[9] 38 U. S. C. (1952 ed.) § 17.

[10] 38 U. S. C. (1952 ed.) § 17a.

these "contractual" provisions were included in the Act for the purpose of reinforcing rather than detracting from the provisions of § 1—the thought apparently being that there was some chance that the Act would be attacked as unconstitutional and that it would consequently be advisable to include alternative bases upon which it could be upheld.[11]

This natural construction we give to § 1 makes it fit well in the pattern of legislation dealing with this subject. The solicitude of Congress for veterans is of long standing.[12] Veterans' pensions, homes, hospitals and other facilities have been supplied on an ever-increasing scale. Many veterans, as did the deceased veteran here, have had to depend upon these benefits for long periods of their lives. Warpouske, for example, appears to have spent more than ten years of his life, at various intervals from time to time, in veterans' homes and hospitals throughout the country. These were the only homes he had at those times. The congressional plan here is that whatever little personal property veterans without wills or kin happen to leave when they die in veterans' homes and hospitals should be paid into the General Post Fund, to be used for the recreation and pleasure of other ex-service men and women who have to spend their days in veterans' homes and hospitals. This idea was expressed by Representative Jennings during the discussion of the 1941 Act on the floor of the House: "And would it not be much better to let that money go into a fund that would inure to the benefit of other veterans than to

---

[11] These fears doubtless arose, in part at least, from the fact that the Circuit Court of Appeals had, in the *Stevens* case, *supra*, declared even the milder provisions of the 1910 Act unconstitutional under the Tenth Amendment, *Stevens* v. *United States*, 89 F. 2d 151, a holding ultimately reversed by this Court.

[12] See the Brief History of Legislation Pertaining to Veterans' Benefits, 38 U. S. C. A. 1.

let . . . it go into a fund under the escheat laws of [a] State?" [13]

Having concluded that the provisions of § 1 are clear and unequivocal on their face, we find no need to resort to the legislative history of the Act.[14] Since the State has placed such heavy reliance upon that history, however, we do deem it appropriate to point out that this history is at best inconclusive. It is true, as the State points out, that Representative Rankin, as Chairman of the Committee handling the bill on the floor of the House, expressed his view during the course of discussion of the bill on the floor that the 1941 Act would not apply to insane veterans incompetent to make valid contracts.[15] But such statements, even when they stand alone, have never been regarded as sufficiently compelling to justify deviation from the plain language of a statute. They are even less so here for there is powerful countervailing evidence as to the intention of those who drafted the bill. The bill was drawn up and sent to the Speaker of the House, in the very form in which it was passed, by the Veterans' Bureau itself.[16] And that Bureau, we are told, has consistently interpreted the 1941 Act as making the sanity or insanity of a veteran who dies in a veterans' hospital entirely irrelevant to the determination of the Government's rights under the Act.

We see no merit in the challenge to the constitutionality of § 1 as construed in this natural manner. Congress undoubtedly has the power—under its constitutional powers to raise armies and navies and to conduct wars— to pay pensions, and to build hospitals and homes for veterans. We think it plain that the same sources of

[13] 87 Cong. Rec. 5203–5204.

[14] Cf. *United States* v. *Bowen,* 100 U. S. 508, 513–514; *National Home* v. *Wood,* 299 U. S. 211, 216.

[15] 87 Cong. Rec. 5203.

[16] See H. R. Rep. No. 609, 77th Cong., 1st Sess., pp. 1–2.

power authorize Congress to require that the personal property left by its wards when they die in government facilities shall be devoted to the comfort and recreation of other ex-service people who must depend upon the Government for care. The fact that this law pertains to the devolution of property does not render it invalid.[17] Although it is true that this is an area normally left to the States, it is not immune under the Tenth Amendment from laws passed by the Federal Government which are, as is the law here, necessary and proper to the exercise of a delegated power.[18]

The judgment of the Oregon Supreme Court is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE WHITTAKER concurs, dissenting.

I do not see how this decedent's estate can constitutionally pass to the United States. The succession of real and personal property is traditionally a state matter under our federal system. *Mager* v. *Grima,* 8 How. 490, 493–494. That tradition continues, *United States* v. *Burnison,* 339 U. S. 87, 91–92; *Clark* v. *Allen,* 331 U. S. 503, 517; *Irving Trust Co.* v. *Day,* 314 U. S. 556, 562; *Lyeth* v. *Hoey,* 305 U. S. 188, 193. An individual can contract away his assets—making the United States the promisee—and the contract will be enforced, provided it

---

[17] See, *e. g., Kolovrat* v. *Oregon, ante,* p. 187. This was also implicit in the holding in *United States* v. *Stevens,* 302 U. S. 623. See n. 11, *supra.* Cf. *Hines* v. *Lowrey,* 305 U. S. 85, in which this Court rejected the contention that the Federal Constitution does not confer any authority upon Congress to deal with mental incompetents.

[18] See, *e. g., Case* v. *Bowles,* 327 U. S. 92; *Oklahoma* v. *Atkinson Co.,* 313 U. S. 508; *United States* v. *Darby,* 312 U. S. 100.

is valid under state law. *United States* v. *Stevens,* 302 U. S. 623, 627. It may be that an action in *quantum meruit* would lie against the estate of a person who, though utterly incompetent as Adam B. Warpouske concededly was, received treatment at a federal hospital.[1] It may be that the United States could appropriate all unexpended funds from federal pensions or federal insurance policies in exchange for the services rendered an incompetent. See *United States* v. *Hall,* 98 U. S. 343; *Wissner* v. *Wissner,* 338 U. S. 655; cf. *Miller Music Corp.* v. *Daniels, Inc.,* 362 U. S. 373. The power of Congress to legislate concerning the claims of all veterans, whether competent or incompetent, is well settled. *Hines* v. *Lowrey,* 305 U. S. 85.

We deal here, however, with an inheritance that the incompetent veteran received from his brother—an estate worth about $13,000. How Congress can provide for that sum to pass to the United States is difficult to understand. Oregon has provided how the property of one who dies intestate and without heirs shall be distributed;[2] and that is its constitutional right under the Tenth Amendment. Never before, I believe, has a federal law governing the property of one dying intestate been allowed to override a state law. Some state inheritance laws are affected by federal policy, as we recently held in *Kolovrat* v. *Oregon, ante,* p. 187. Thus where a treaty

---

[1] See Restitution, Restatement of the Law, Am. L. Inst. (1937), § 114; 5 Corbin on Contracts (1951) § 1109.

[2] Ore. Rev. Stat. 120.010 provides:

"Immediately upon the death of any person who dies intestate without heirs, leaving any real, personal or mixed property, interest or estate in this state, the same escheats to and vests in the state, subject only to the claims of the creditors and as provided in ORS 120.060 to 120.130; and the clear proceeds derived therefrom shall be paid into and become a part of the Common School Fund of this state and be loaned or invested by the State Land Board, as provided by law."

made by the United States with another nation provides for reciprocal inheritance rights by the nationals of the two countries, a State cannot provide otherwise. If it could, one State would indeed be revising the foreign policy that the Federal Government makes. In the context of the Fourteenth Amendment, the rights of a State to provide rules governing inheritance may also be compelled to bow to federal policy. See R. S. § 1978, 42 U. S. C. § 1982.

Yet the Supremacy Clause is not without limits. For a federal law to have supremacy it must be made "in pursuance" of the Constitution. The Court, of course, recognizes this; and it justifies this federal law governing devolution of property under the Necessary and Proper Clause of Art. I, § 8.

The power to build hospitals and homes for veterans and to pay them pensions is plainly necessary and proper to the powers to raise and support armies and navies and to conduct wars. The power to provide for the administration of the estates of veterans (which are not made up of federal funds owing the veterans) is to me a far cry from any such power. But the present Act is of that character.

This federal law governing estates of veterans is phrased in the language of contract. It is designed to draw into the federal treasury all estates of the kind mentioned, whether they be worth six cents or a million dollars. The federal claim is not for services rendered, as no effort is made to restrict the amount of the federal claim to benefits received. The Act plainly is a federal succession law.

The Act under which the United States purports to act is now found in 38 U. S. C. §§ 5220–5228. In its present form, it came into the law in 1941. Act of Dec. 26, 1941, 55 Stat. 868. Section 1 regulates the disposition of the property of any veteran who dies while in a Veterans' Hos-

pital and who leaves personal property not disposed of by will and to which no surviving spouse, next of kin or heirs are entitled under the laws of his domicile. Such property, the Act says, "shall immediately vest in and become the property of the United States." § 1. The acceptance of care or treatment at a Veterans' Hospital is by the terms of the Act acceptance of the provisions of the Act, and has "the effect of an assignment" of the property effective at death. § 1. The fact of death in a Veterans' Hospital of a veteran "leaving no spouse, next of kin, or heirs" gives rise "to a conclusive presumption" of a valid contract for the disposition of the property in that way to the United States. § 2. Moreover, the Veterans' Administration is authorized to administer the estate, paying creditors' claims, if presented within designated times, and granting them the preference and priorities prescribed by local law. § 4.

We know that, while the Act is based on "a conclusive presumption" that a contract to assign the property to the United States was made, there was in fact no contract in this case. During the period of Warpouske's hospitalization—from March 1, 1956, to March 19, 1956, the day of his death—he was either comatose or semicomatose.[3] We deal with a presumption that is contrary to the fact (cf. *Tot* v. *United States,* 319 U. S. 463). We have then a case involving the power of Congress to provide for the administration of the estate of a deceased veteran where he has in fact made no assignment of it to the Federal Government. To what power is that necessary and proper?

---

[3] Adam Warpouske spent a large part of his life in Veterans' Hospitals, especially during the years from 1930 to 1945. (The record also shows that he received care in the facilities of various states.) But the claim to administer his personal property arises solely from "the fact of death" in a Veterans' Hospital.

Only recently we warned against an expansive construction of the Necessary and Proper Clause. We stated that it is "not itself a grant of power, but a *caveat* that the Congress possesses all the means necessary to carry out" the powers specifically granted. *Kinsella* v. *Singleton,* 361 U. S. 234, 247. Powers not given "were reserved," as Madison said. VI Writings of James Madison (Hunt ed.) 390. And "no powers were given beyond those enumerated in the Constitution, and such as were fairly incident to them." *Ibid.*

Veterans or anyone else may make the United States a beneficiary of their estate, absent a state law that precludes it. See *United States* v. *Burnison, supra.* But if it is "fairly incident" to raising and supporting armies and navies and conducting wars for the United States to take over the administration of the personal property of veterans who die intestate, I see no reason why Congress cannot take over their real estate too. I see no reason why, if the United States can go as far as we allow it to go today, it cannot supersede any will a veteran makes and thus better provide for the comfort, care, and recreation of other ex-service men and women who are dependent on the United States for care. And the more money the Federal Government collects for veterans the better the care they will receive. No greater collision with state law would be present where Congress took realty or displaced an entire will than here. Oregon's law providing for escheat is as explicit as her law providing for the administration of the estates of deceased people. If a contract between the United States and an utterly incompetent person can be conclusively presumed to exist when the incompetent dies intestate, it can be where he leaves a will. If it can be conclusively presumed in case of a veteran, it can be conclusively presumed in case of any federal employee, in case of any

federal officeholder, in case of any federal pensioner. Of course Congress cannot be expected to use this vast new power to the extreme. But we—unlike England—live under a written Constitution that limits powers, not entrusting the Constitution to the conscience of the legislative body.

The Tenth Amendment does not, of course, dilute any power delegated to the national government. That is one face of the truism that runs through our decisions. *United States* v. *Darby,* 312 U. S. 100, 124; *Oklahoma* v. *Atkinson Co.,* 313 U. S. 508, 534; *Case* v. *Bowles,* 327 U. S. 92, 101. But when the Federal Government enters a field as historically local as the administration of decedents' estates, some clear relation of the asserted power to one of the delegated powers should be shown. At times the exercise of a delegated power reaches deep into local problems. *Wickard* v. *Filburn,* 317 U. S. 111, allowed the commerce power to extend to home-grown and home-used wheat, because total control was essential for effective control of the interstate wheat market. But there is no semblance of likeness here. The need of the Government to enter upon the administration of veterans' estates—made up of funds not owing from the United States—is no crucial phase of the ability of the United States to care for ex-service men and women or to manage federal fiscal affairs.

Today's decision does not square with our conception of federalism. There is nothing more deeply imbedded in the Tenth Amendment, as I read history, than the disposition of the estates of deceased people. I do not see how a scheme for administration of decedents' estates of the kind we have here can possibly be necessary and proper to any power delegated to Congress.

Raising money by borrowing or by taxing are explicitly provided for in Art. I, § 8. Raising money by appropriating assets of those who have a relationship with the

Federal Government (as most people do today) is not among the enumerated powers. At bottom of the present statute, as the Court points out, is a desire to make those who use a Veterans' Hospital help finance its operations.[4] Congress can set rates for services rendered; it can obtain from patients assignments of assets to the United States; it can induce and encourage people to make these hospitals beneficiaries under their wills. But I do not see how it is possible for the United States to take a man's property without his consent when the United States is not a creditor in the accepted sense. The only constitutional way in which that can be done is by taxation or by condemnation. This law as applied is indeed a levy that has no support in the Constitution; and it makes a serious inroad on the Tenth Amendment. With all deference, I dissent.

---

[4] The inspiration for this law, as seen from the legislative history (H. R. Rep. No. 609, 77th Cong., 1st Sess.; S. Rep. No. 900, 77th Cong., 1st Sess.), was the Veterans' Administration, a fact which perhaps makes relevant the following observation: "Politicians and taxpayers have assumed (with occasional phases of doubt) that a rising total in the number of civil servants must reflect a growing volume of work to be done. Cynics, in questioning this belief, have imagined that the multiplication of officials must have left some of them idle or all of them able to work for shorter hours. But this is a matter in which faith and doubt seem equally misplaced. The fact is that the number of the officials and the quantity of the work are not related to each other at all. The rise in the total of those employed is governed by Parkinson's Law and would be much the same whether the volume of the work were to increase, diminish, or even disappear. The importance of Parkinson's Law lies in the fact that it is a law of growth based upon an analysis of the factors by which that growth is controlled." Parkinson, Parkinson's Law (1957), pp. 3-4.