EDWARD F. MCELROY, *Adm'r vs.* RAYMOND H. HAWKSLEY, *Gen. Treas.*

DECEMBER 17, 1963.

PRESENT: Condon, C. J., Roberts, Powers and Joslin, JJ.

JOSLIN, J.   This is an original statutory petition brought pursuant to G. L. 1956, §9-14-24, by Edward F. McElroy in his capacity as administrator of the estate of John J. Quill and by Raymond H. Hawksley in his capacity as gen-

eral treasurer of this state. It seeks our determination of the following question:

> "Does Rhode Island General Laws, 1956, Section 30-24-9, violate provisions of the Rhode Island Constitution, Article 3, Constitution of Rhode Island, Article I, Section 16, or the United States Constitution, Article 14, Section 1?"

Reference to the federal constitution is obviously to the articles of amendment and will be so considered by us.

John J. Quill, a veteran and resident of Rhode Island, being, according to the administrator, "unable to earn a living or care for his personal needs," was admitted in 1948 to the Rhode Island veterans' home, hereinafter referred to as the Home. While an inmate there he died intestate on November 26, 1957 leaving him surviving two brothers and a sister. Subsequent to his death funds on deposit in his name in a local bank in the amount of $6,010.01 were withdrawn and paid to the general treasurer who in turn refused the demand of the administrator that such funds be turned over to him. Thereupon this petition was filed.

The statute the constitutionality of which is questioned reads as follows:

> "30-24-9. Property of deceased inmates.—All goods, chattels, property, money, and effects of a deceased inmate of the Rhode Island veterans' home, which have not been otherwise disposed of by him, shall upon his decease become the property of the state of Rhode Island, and shall, by the assistant director of social welfare in charge of community services, be applied to the uses and purposes of said home; provided, however, that said assistant director may in his discretion deliver to any surviving relative of said deceased member any article or articles of such property or effects as may serve as a memento of said deceased inmate."

The legislative plan as it has here developed for the state to provide relief for needy veterans dates back at least to 1885 when a commission was created to inquire "into the needs of worthy dependent soldiers and sailors of the late

war" and the needs of their families. P. L. 1885, chap. 488.

The first integrated act providing for the establishment of a home and the predecessor to our present statutes is found in P. L. 1889, chap. 733. It is entitled "An Act To Establish And Maintain A Soldiers' Home, And To Provide For The Relief Of Needy Union Soldiers, Sailors And Marines Of The Late War, And The Dependents Of Deceased Soldiers, Sailors And Marines." The format there established for providing relief for ex-servicemen still remains. Principal beneficiaries under the act were veterans who by reason of wounds, disease, old age, or other infirmities were unable to earn their living and had no adequate means of support. Benefits consisted principally of direct relief payments for veterans and dependents and an opportunity for veterans to receive lodgings and sustenance at a soldiers' home, which the board created under the act was directed to provide.

It was further provided that a veteran otherwise entitled to relief thereunder and having no parents, wife or children dependent upon him could, as a condition precedent to enjoying benefits thereunder, be required to become an inmate of the home. A subsequent amendment provided that the property of an inmate not otherwise disposed of should upon his death become the property of the state to be used by it for the purposes of the home. P. L. 1896, chap. 305, now G. L. 1956, §30-24-9.

That use restriction was subsequently changed and thereafter any such property or its avails was required to be used to provide comforts and conveniences for other inmates of the Home. P. L. 1921, chap. 2035, now G. L. 1956, §30-24-6. From time to time as this country became involved in other wars and military engagements, the possible beneficiaries under the act originally restricted to eligible veterans of the Civil War and their dependents were substantially enlarged so as to include those similarly situated who had served in the armed forces subsequent to the Civil War.

The original act of 1889, as amended, is now found in G. L. 1956, chaps. 17 and 24 of title 30.

The purpose of this legislation is self-evident. It falls within the broad classification of those kinds of benefits which a grateful people in this state have from time to time conferred upon those who served in the armed forces in time of war. Such benefits include not only those available at the Home, but also rights of employment, retention of seniority rights, preference in public employment, pensions and tax exemptions. Specifically, however, the section in question is part of an act which makes it possible for a veteran like Quill, who by reason of some infirmity cannot earn his living and has no adequate means of support, to be sustained at the Home at state expense for an extended period of time amounting in this instance to approximately nine years.

The benefits afforded veterans under the act are free. There is not imposed either by statute or by regulations of those entrusted with the management of the Home the requirement that in *all events* a portion or all of any pension or other property of the veteran be turned over to the state or the Home either during the lifetime or after the death of an inmate.

Military service, an infirmity by reason of which there is an inability to earn a living, and a lack of adequate means of support are the principal criteria for admission. Once admitted, the inmate receives from the state, without charge, the care and comforts available at the Home subject only to the condition that if while an inmate he dies intestate his property shall become that of the state. The legislative pattern as it has here evolved follows in philosophy that of congressional enactments which have heretofore been passed on by the federal courts.

In *United States* v. *Stevens,* 302 U. S. 623, the Supreme Court interpreted the 1910 Act of the Congress (24 U.S.C.

§136) which provided in substance that the admission of a qualified veteran to the National Home for Disabled Volunteer Soldiers constituted a binding contract between him and the board of managers of said home; that the terms of such contract were that on his death intestate, leaving no heirs-at-law or next of kin, his personal property should vest in the board of managers for the benefit of the post fund, subject to reclamation by a person entitled thereto by inheritance at any time within five years after the death of such veteran; that the form of application for admission to said home should be so phrased as to give reasonable notice of this provision; and that the consent of the applicant to the provision be required as a condition precedent to admission to said home.

The court there held in a suit brought more than five years after the veteran's death that, having signed such an application, he had entered into an enforceable contract and that having died intestate funds of his on deposit in a Massachusetts bank went to the post fund rather than to his surviving heirs. The court's conclusion was premised in part on the Massachusetts law that an owner of property is not prevented by the statute of wills from stipulating by contract as to its disposition.

Subsequently Congress in 1941 amended the 1910 Act, and as amended the act did not contain the contractual provisions passed upon in *Stevens* but did provide that when a veteran dies while a member or patient in any facility, or any hospital while being furnished care or treatment therein by the Veterans' Administration, all his personal property "not disposed of by will or otherwise, shall immediately vest in and become the property of the United States as trustee for the sole use and benefit of the General Post Fund * * *." 38 U.S.C.A. §5220. The amended act further provided in another section that the death of a veteran in a veteran's hospital "shall give rise to a conclusive presumption of a valid contract * * *." 38 U.S.C.A. §5221.

The act so amended was considered in *United States* v. *Oregon*, 366 U. S. 643. There both the United States and the State of Oregon claimed the personal property of an inmate who had died intestate at a United States Veterans' Administration Hospital in Oregon. He was incompetent both at the time of his admission and throughout his residence at the home. The court accepted the findings of the Oregon courts that the decedent by reason of his incompetency could not and did not enter into a contract and limited its decision to whether or not the federal government could prevail in the absence of such a contract. In holding that it was within the congressional power to provide an automatic vesting without necessity for a contract a majority of the court said at page 648:

> "We see no merit in the challenge to the constitutionality of § 1 as construed in this natural manner. Congress undoubtedly has the power—under its constitutional powers to raise armies and navies and to conduct wars—to pay pensions, and to build hospitals and homes for veterans. We think it plain that the same sources of power authorize Congress to require that the personal property left by its wards when they die in government facilities shall be devoted to the comfort and recreation of other ex-service people who must depend upon the Government for care. The fact that this law pertains to the devolution of property does not render it invalid. Although it is true that this is an area normally left to the States, it is not immune under the Tenth Amendment from laws passed by the Federal Government which are, as is the law here, necessary and proper to the exercise of a delegated power."

The court in *Oregon* did not, however, pass on the constitutional issues here raised, its decision being limited to a holding that the Congress could without violating the tenth amendment enact legislation providing for the automatic transfer of property of a deceased inmate of a veterans hospital even in the absence of a contract between

the government and the decedent. The court did, however, in passing observe that the contractual provisions not relied on by it had been included in the act in order to obviate a possible attack on its constitutionality.

It is well settled that we will refrain from passing on a constitutional question when it is clear that the case before us can be decided on another point and that a determination of such a question is not indispensably necessary for a disposition of the case. *State* v. *Berberian,* 80 R. I. 444. If it can be determined that Quill's obligation was contractual and that his property passed to the state by virtue of an agreement rather than automatically under the statute, we do not reach the constitutional issues here raised by petitioners.

Quill consented to having such of his property as he might not otherwise dispose of during his lifetime pass under §30-24-9. His consent was manifested by his entrance into the Home and his presence there as an inmate for several years. The legislature did not require him to enter the Home or, once having entered, did it deny him the right to remove therefrom at will. It did not limit his right during his lifetime to give his property away, or to spend it as he wished, or to dispose of it by will as he might desire. It did, however, provide what should happen to his property if at death he was an inmate and he had failed otherwise to dispose of it.

The legislature recognized its obligation to Quill and those like him; it selected him as a member of a class to which class alone it gave the benefits of residence at the Home; and it annexed, as was within its province, a condition upon which the gratuity was extended.

In enacting §30-24-9 the legislature did not thereby evidence an intent to change the laws of descent and distribution; rather did it indicate a purpose to extend to a restricted class of persons, of whom Quill was one, the privileges

and benefits of the Home. Its beneficence was subject, however, to the condition that if he did not otherwise dispose of his property it should upon his death become the property of the state if at such time he was in inmate status.

Under well-settled rules of law, we must presume that Quill had knowledge of the provisions of §30-24-9 and that his failure otherwise to dispose of his property would result upon his death in its being used, at the expense of his next of kin and heirs-at-law, to provide comforts and conveniences for those who had been his companions at the Home and or others who might in the future by force of circumstances be required there to become inmates. See *Smith* v. *Bradford,* 51 R. I. 289, 295; *Kenyon* v. *United Electric Rys.,* 51 R. I. 90, 95.

By applying for and receiving benefits under chaps. 17 and 24 of title 30 he both consented to and contracted with the state as to what disposition would be made of any property he might leave in the event of his death intestate and an inmate. His consent thereto can be inferred just as well from his conduct in entering the Home and remaining there as it could be from a specific oral or written agreement. Having been given, he is as effectively bound thereby as if his obligation were specifically set forth in a duly executed writing. See *McCarthy* v. *Hughes,* 36 R. I. 66, 73.

It cannot be objected to that the oral agreement so made is invalid by virtue of being testamentary in nature. As we have indicated, Quill entered into a contract which provided that the state would care for him at the Home and that if he died intestate and while an inmate his property would become that of the state. Such a service agreement is no more invalid in this state as an attempted testamentary disposition than is a contract to leave property to another in a will. In either case, the rationale by which the validity of such a contract is upheld is to construe it as imposing a trust on the property in favor of the promisee,

there being "no difference in principle between contracts to be performed in life or at death." *Spencer* v. *Spencer*, 25 R. I. 239. At the time Quill entered the Home the obligations of the state under the contract were executory; at the time of his death, executed. His obligations thereunder should now be enforced. *O'Connell* v. *United States,* 37 F. Supp. 832.

The conclusions we have reached are in line with the decisions in other jurisdictions. It has generally been held that those entrusted with the management and control of like institutions and who have been given the power to make reasonable rules and regulations therefor are authorized thereunder to take away from an inmate either during lifetime or upon death his right to a federal pension or to require that he pay a portion of such pension into a fund to be devoted either to the benefit of the institution or its inmates.

The majority of such cases proceeded on the theory that support being a gift of the state, the home or its agents may make the enjoyment of the benefits available dependent upon the conditions imposed. *Howell* v. *Sheldon,* 82 Neb. 72; *O'Donohue* v. *New Jersey Home for Disabled Soldiers,* 65 N. J. L. 484; *Brooks* v. *Hastings,* 192 Pa. 378; *Ball* v. *Evans,* 98 Iowa 708. As was said in *Ball* v. *Evans*: "No one is compelled to accept the conditions and become an inmate of the home. One may decline, and remain outside."

In *Brooks* v. *Hastings, supra,* the Pennsylvania court passed on the principal constitutional issues here raised, and in upholding the regulation therein in issue said at page 387:

>    "The contention that the requirement in question is contrary to that provision of the state and federal constitutions which prohibits the taking of property of the citizen without due process of law, and without making just compensation, has no application. This

is not the taking of property in any conceivable sense. It is the creation of a condition upon which charitable support may be obtained under a contract which is voluntarily made, providing for the contribution of something towards the maintenance of the institution which furnishes the support. The applicant is under no obligation to make such a contract, but if he does make it and gets the benefit he must take it as it is given, and keep his contract like all other good citizens are obliged to do."

Just as the contention there raised had no application, so too it has no application here. This conclusion applies as well to the contention that §30-24-9 constitutes an improper delegation of power as it does to those that it violates the due process and equal protection clauses of the fourteenth amendment to the federal constitution and the provision of the state constitution against the taking of private property for public uses without just compensation.

There remains for our consideration only the contention advanced by the *amicus curiae* herein, the thrust of which, as we understand it, is that the constitutional rights of Quill's heirs have been violated, they having an alleged "natural" or "law-given" right to inherit his property upon his death intestate. It is a sufficient answer to such contention to refer to *United States* v. *Stevens, supra,* at page 627, where the court quoting from *Jefferson* v. *Fink,* 247 U. S. 288, 294, said: " 'Not until the ancestor dies is there any vested right in the heir.' " Having already found that Quill's obligation was contractual, whether the right of his heirs was "natural" or "law-given" or only a privilege is of no significance. See *Hazard* v. *Bliss,* 43 R. I. 431. Whether right or privilege, it accrued only upon his death and as of that time Quill, by virtue of his contract, had no property which could pass to them. Their alleged constitutional right to inherit, if any they had, was not therefore violated.

For the reasons indicated it is our opinion that in the posture in which this case has been presented to us §30-24-9

does not violate the provisions of art. III, or art. I, sec. 16, of the constitution of this state, or art. XIV of amendments, sec. 1, of the constitution of the United States.

On January 6, 1964, the parties may present for our approval a form of declaratory decree, in accordance with this opinion, for entry by the court.

*Gallogly, Beals & Tiernan, David F. Sweeney,* for Administrator.

*J. Joseph Nugent,* Attorney General, *Corinne P. Grande,* Special Counsel, for State, for General Treasurer.

*Thomas H. Quinn, Frank Anzivino, Jr.,* Amicus Curiae.