GREAT NORTHERN NEKOOSA CORPORATION AND SUB-SIDIARIES, Plaintiff,

v.

UNITED STATES, Defendant.

No. 589–89T.

United States Court of Federal Claims.

Aug. 1, 1997.

Christopher Kliefoth, McDermott, Will & Emery, Washington, DC, attorney of record for plaintiff.

George L. Squires, Tax Division, Court of Federal Claims Section, Department of Jus-

tice, Washington, DC, with whom were Mildred L. Seidman, and the Assistant Attorney General, attorneys of record for the defendant.

## OPINION

HORN, Judge.

The portion of the above-captioned case discussed below is before the court on defendant's motion for partial summary judgment,[1] pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). Plaintiff, Great Northern Nekoosa Corporation and Subsidiaries (GNN), filed a complaint against the United States in this court, which, among other claims, seeks a refund of federal income taxes for the 1981 tax year, plus interest. In its claim for refund before the Internal Revenue Service (IRS), and in its complaint filed in this court, the plaintiff alleges that it made a charitable contribution of two conservation easements in favor of the State of Maine in 1981. Plaintiff, therefore, asserts that it is entitled to a charitable deduction for the 1981 tax year of "at least $19,274,000," which allegedly represents the difference in the fair market value of the property at issue, before and after the granting of the conservation easements.

The defendant's motion for partial summary judgment argues that pursuant to the applicable section of the Internal Revenue Code (IRC), the two conservation easements conveyed by the plaintiff to the State of Maine on August 14, 1981, fail to qualify as charitable contribution deductions because the plaintiff retained the right to extract subsurface minerals, including sand and gravel, from the easement lands, using surface mining methods.

The plaintiff's first response to defendant's argument is that there are material issues of fact in dispute which make even partial summary judgment inappropriate.[2] The plaintiff also asserts that the IRC is not necessarily violated simply because the easements failed to preclude surface mining on the easement lands; that defendant is wrong to rely solely on IRC § 170(h)(5); that defendant has ignored IRC § 170(h)(6), which defines a "qualified mineral interest;" that GNN's retained rights to extract sand, gravel, and road construction materials do not qualify as retention of "qualified mineral interests" under IRC § 170(h), since they are surface, and not subsurface minerals; and that as a factual matter, GNN's limited rights to extract sand, gravel, and construction minerals only would have limited, localized impact on the easement lands and, therefore, are not inconsistent with the conservation purpose of the easements or the relevant statute.

## FACTS

The plaintiff is a corporation organized and existing under the laws of the State of Maine. During 1981, the year in suit, plaintiff GNN was an integrated, forest products company. Among plaintiff's holdings were about two million acres of timberland in northern Maine, which produced wood, virtually all of which was utilized in plaintiff's two forest product processing plants in Millinocket and East Millinocket, Maine. Some of the plaintiff's timberlands adjoined the east and west branches of the Penobscot River, Lobster Lake, and Lobster Stream. Those timberlands, the two forest product processing plants, and a sawmill constituted a division of

---

1. The defendant filed a status report in this court in which the defendant represented that a number of issues which remain in the above-captioned case are likely to be settled, if the plaintiff provides satisfactory responses to three questions previously posed by defendant. Therefore, resolution of the issues included in this motion for partial summary judgment on the issue of the charitable contributions could dispose of all the issues in the above-captioned case, with the exception of a casualty loss deduction issue resulting from a windstorm in the Telos area of Maine during 1980, which remains for resolution.

2. Defendant maintains that the issues raised by its motion for partial summary judgment can be resolved as a matter of law. If summary judgment is not appropriate, however, the United States maintains that two factual defenses defeat plaintiff's charitable contribution deduction claim, and, therefore, need to be tried, including: 1) whether donative intent existed, based on plaintiff's alleged inability to prove that the conveyances were not made in exchange for a *quid pro quo;* and 2) whether there is evidence that there was any significant difference in the fair market value of the property subject to the easements before and after the contribution.

the plaintiff referred to as Great Northern Paper Company, Great Northern Paper, or Great Northern.

In January 1979, the staff of the Maine Land Use and Regulation Commission (LURC) proposed special recreation protection zoning for the corridors of the east and west branches of the Penobscot River in Maine. Following an extended public hearing on numerous proposals for maintaining the special character and recreational value of the Penobscot waterway, including portions of the east and west branches of the Penobscot River and associated lakes, Great Northern requested that LURC defer action on the staff proposals. LURC agreed to give Great Northern the opportunity to voluntarily develop a resource protection plan for the area.

On November 19, 1980, Great Northern submitted to the State of Maine its draft Resource Protection Plan pertaining to those lands adjacent to portions of the east and west branches of the Penobscot River in Maine. The draft plan, among other effects, would reserve to plaintiff the right to construct hydropower facilities, contingent upon obtaining the necessary permits. On February 6, 1981, the plaintiff and the State of Maine entered into two Memoranda of Agreement, each of which recited, in part:

The State and Great Northern acknowledge the existence of valuable resources on and adjacent to the Penobscot River [also 'Lobster Lake and Lobster Stream' in Ex. 3] and that the protection of these resources can best be achieved by carrying out the provisions of this Agreement.

The purpose of this Agreement is to assist in protecting those resources within a framework of continued use of the river corridor [also 'lake and stream corridors' in Ex. 3] for timber harvesting, other traditional uses of the region's forest lands, and hydroelectric power generation and transmission.

Subject to fulfillment of the terms of the two Memoranda of Agreement, the plaintiff agreed to contribute to the State two "perpetual" conservation easements on several 500 foot wide tracts, totaling approximately 8,000 acres (3,200 acres and 4,800 acres), in northern Maine. The terms of the 3200 acre Memorandum of Agreement included the following:

2. ...In order to facilitate recreation management Great Northern will grant property leases to the State, upon terms satisfactory to Great Northern and the State within the Easement Lands in order that administrative structures and areas as defined in the Deed of Conservation Easement, may be erected, maintained and utilized.

3. The State recognizes that certain sections of the West Branch of the Penobscot River as described in paragraph 1 above have potential for hydroelectric development and that Great Northern intends to make application to the appropriate state and federal agencies to obtain permission to build hydroelectric facilities.

4. The State recognizes that the access roads to the West Branch of the Penobscot River are built and maintained by Great Northern for the purpose of carrying out forest and water management activities. The State agrees not to undertake promotion of the area which will compromise safe use of the roads for these management activities.

5. Both parties recognize that all rights reserved or retained by Great Northern in connection with the donation of this Conservation Easement are and shall remain subject to applicable requirements, regulations, and laws of state, federal, and local governmental bodies having jurisdiction, and that nothing in this Agreement or in the Deed of conservation Easement will affect or supercede such legal requirements.

6. Great Northern will propose to the Maine Land Use Regulation Commission ('LURC') a Resources Protection Plan for the corridor for designation as a Resource Plan Protection subdistrict. To the extent allowed by law, notwithstanding anything in paragraph 5, the provisions of the Resource Protection Plan shall supersede land use districts and standards adopted by LURC after said plan has been approved by LURC.

7. Either party may cancel this Agreement at any time prior to the grant and acceptance of the Conservation Easement.

The terms of the 4800 acre Memorandum of Agreement included the following:

2. ...In order to facilitate recreation management Great Northern will grant property leases to the State, upon terms satisfactory to Great Northern and the State within the Easement Lands in order that administrative structures and areas as defined in the Deed of Conservation Easement, may be erected, maintained and utilized.

3. The State recognizes that the access roads to the West Branch of the Penobscot River are built and maintained by Great Northern for the purpose of carrying out forest and water management activities. The State agrees not to undertake promotion of the area which will compromise safe use of the roads for these management activities.

4. Both parties recognize that all rights reserved or retained by Great Northern in connection with the donation of this Conservation Easement are and shall remain subject to applicable requirements, regulations, and laws of state, federal, and local governmental bodies having jurisdiction, and that nothing in this Agreement or in the Deed of Conservation Easement will affect or supercede such legal requirements.

5. Great Northern will propose to the Maine Land Use Regulation Commission ('LURC') a resource management plan for the corridor for designation as a Resource Plan Protection subdistrict. To the extent allowed by law, notwithstanding anything in paragraph 4, the provisions of the Resource Protection Plan shall supercede land use districts and standards adopted by LURC after said plan has been approved by LURC.

6. Either party may cancel this Agreement at any time prior to the grant and acceptance of the Conservation Easement.

On June 17, 1981, LURC approved Great Northern's proposed Resource Protection Plan, which became effective on July 8, 1981.

The Resource Protection Plan sets forth its purpose and objectives as follows:

The purpose of this Resource Protection Plan is to provide for the continued effective management of the renewable forest and water resources while recognizing and protecting the recreational and other natural values of the East Branch and West Branch of the Penobscot River and Lobster Lake and Stream.

The objective of the Plan is to ensure a continuous yield of forest products to support manufacturing facilities, to protect water quality and quantity for present and potential uses, including hydroelectric power generation, to provide for continued recreational uses associated with the river, lake and stream, and to provide for the continued protection of the natural character of the areas consistent with the land use activities proposed in this plan.

The Resource Protection Plan also includes provisions which contain the following restrictions:

[Section IV] B. Subject to the provisions of paragraphs D and E, the following uses shall be allowed without a permit when in conformance with the standards hereinafter set forth:

\* \* \*

3. Mineral extraction affecting an area of less than three acres in size for road purposes when in conformance with the standards in Appendix E;

\* \* \*

[Section IV] D. Subject to the provisions of paragraph E, the following uses shall be allowed only upon the issuance of a permit from the Land Use Regulation Commission:

\* \* \*

9. Mineral extraction for road purposes affecting an area of three acres or more in size;

10. Mineral extraction for road purposes in areas zoned P–SG or P–FW prior to the Commission's approval of this Plan, and in that area known as Ripogenus Gorge, as defined above;

11. Mineral extraction where such activity is incidental to the construction of a hydroelectric facility; and

\*    \*    \*

[Section IV] E. The uses set forth in paragraphs B and D shall be subject to the following further requirements:

1. Mineral extraction is prohibited in those areas which were zoned P–WL, except as provided in Section IV, D, 11, and P–RR prior to the Commission's approval of this Plan;

2. Filling, grading, draining, dredging or alteration of water table or level is prohibited in areas zoned P–RR or P–UA prior to the Commission's approval of this Plan; and

3. In the area zoned P–RR (Appalachian Trail) prior to the Commission's approval of this plan, a permit will be required from the Commission to carry out those activities described in paragraph B in that area of the P–RP subdistrict commencing 50 feet from the center line of Great Northern's land management roads to the outer bounds of the P–RP subdistrict. In those areas where the Appalachian Trail traverses existing Great Northern roads and/or bridges, Great Northern will be allowed to conduct maintenance activities as provided in Section 10.07(B) of the Land Use Districts and Standards dated June 26, 1980.

Moreover, additional restrictions regarding the method of mineral extraction are set out in Appendix E to the Resource Protection Plan:

The following requirements shall apply to mineral extraction activities in the Resource Plan Protection Subdistrict:

a. No portion of any ground area disturbed by the extraction activity on a face sloping toward the water, shall be closer to the normal high water mark of a flowing or standing body of water than is indicated by the following table provided, however, no portion of such ground area on a back face shall be closer than 50 feet:

\*    \*    \*

b. Within 250 feet of any water body the extraction area shall be protected from soil erosion by ditches, sedimentation basins, dikes, dams, or such other control devices which are effective in preventing sediments from being eroded or deposited into such water body. Any such control device shall be deemed part of the extraction area for the purpose of Subsection a, above;

c. No portion of any ground area disturbed by the extraction activity shall be closer than 250 feet from any public roadway or 250 feet from any property line in the absence of the prior written agreement of the owner of such adjoining property;

d. A natural vegetative screen of not less than 50 feet in width shall be retained from administrative structures or areas as defined in the Conservation Easement; and

e. If any mineral extraction operation located within 250 feet of any administrative structure or area as defined in the Conservation Easement or a facility intended primarily for public use, excluding privately owned roads, is to be terminated or suspended for a period of one year or more, the site shall be rehabilitated by grading the soil to a slope of 2 horizontal to 1 vertical, or flatter.

Subsequently, on August 14, 1981, the plaintiff executed two Deeds of Conservation Easement ("conservation easement") in favor of the State of Maine. One conservation easement (the "3200 acre easement") covered approximately 3,200 acres of land along the west branch of the Penobscot River up to 500 feet from both shorelines. The other conservation easement (the "4800 acre easement") covered approximately 4,800 acres of land along the east and west branches of the Penobscot River up to 500 feet from both shorelines and a portion of land along Lobster Lake and Lobster Stream. The two conservation easements each provide for the

conveyance of "a perpetual Conservation Easement ... for the purpose of conserving and utilizing the resources of certain portions of the Penobscot River ... for the Grantor and the people of Maine." Each of these conservation easements also provide, in pertinent part, that the plaintiff retains the following rights to extract minerals, including gravel, from easement lands:

Also excepting and reserving from said Easement the right to construct and maintain roads (including the extraction from the Easement Lands of gravel to be used in such construction and maintenance) as necessary for ingress and egress between those lands within 50 feet of the centerline of road rights-of-way in the corridor as excepted hereinbefore and lands of the Grantor adjacent to the Easement Lands.

The Conservation Easement conveyed herein consists of the following covenants and restrictions, which shall apply to the above described parcels of land subject to the Conservation Easement:

(1) No residential or commercial structures shall or may be erected, other than in connection with the generation or transmission of electricity as mentioned above, the mining or extraction of sand and gravel, the harvesting of timber, any recreational management activity conducted or approved by the Grantee, or on existing leases which will be subject to state regulations then in effect. Commercial structures shall be construed as those structures or facilities unrelated to recreational management activities as contemplated by this Conservation Easement; such commercial structures to include by way of example but not limited to those erected, installed, designed, or used in connection with a private business or enterprise, such as a gas station, store, or boat rental facility.

\* \* \*

The Grantor reserves all its rights in and to and uses of Easement Lands not inconsistent with the rights, covenants and restrictions set forth herein including the right to harvest timber and extract minerals.

Furthermore, the 3200 acre easement stated that the grantor retains the "right to locate borrow pits and excavate therefrom material necessary for construction" of hydroelectric and associated facilities on the land.

In 1990, the Georgia Pacific Corporation purchased plaintiff, and subsequently sold the timberlands and plants in Maine to Bowater Corporation (Bowater). From at least 1986 through 1993, GNN, Georgia Pacific, and Bowater and their licensees, conducted surface mining operations in approximately eight gravel pits located within the conservation easement lands.

The plaintiff's consolidated federal income tax return for the 1981 tax year was filed on September 15, 1982, with the Internal Revenue Service Center, Andover, Massachusetts. Subsequently, on October 11, 1988, the plaintiff filed a timely claim for refund for the 1981 tax year, form 1120X, also with the Internal Revenue Service Center, Andover, Massachusetts. In its claim for refund for tax year 1981, plaintiff claims that:

In 1981, taxpayer made a charitable contribution of two conservation easements in favor of the State of Maine. Taxpayer is entitled to a charitable deduction of at least $19,274,000, which represents the difference in the fair market value of the property subject to the easements before and after the contribution.

The IRS did not deem the plaintiff's claims allowed or disallowed within six months of the plaintiff's filing of its claims for refund. Therefore, the plaintiff filed the above-captioned case before this court reasserting plaintiff's claims.

### DISCUSSION

Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ. P.) and is similar in language and effect.[3]

---

**3.** In general, the rules of this court are patterned on the Federal Rules of Civil Procedure. There-

fore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of

Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Rule 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510–11; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd without op.*, 937 F.2d 622 (Fed.Cir. 1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-

sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Stated otherwise, if the nonmoving party cannot present the evidence to support its case under any scenario, then there should be no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs.*, 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552; *Lima Surgical Assocs.*, 20 Cl.Ct. at 679.

Pursuant to Rule 56, the motion for summary judgment may succeed, whether or not

this court, including RCFC 56. *See Jay v. Sec'y DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l Inc. v. United States*, 821 F.2d

634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories, and admissions, in order to demonstrate that a genuine issue for trial exists. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *Lew-Ron Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.,* 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Casualty & Sur. Co.,* 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir.1968); *Bataco Indus., Inc. v. United States,* 29 Fed. Cl. 318, 322 (1993), *aff'd,* 31 F.3d 1176 (Fed. Cir.1994). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc.,* 812 F.2d at 1391.

After an examination of the record and parties' pleadings in the above-captioned case, this court determines that no genuine issues of material fact exist with regard to the charitable contribution issues raised in defendant's motion for partial summary judgment. Therefore, this case is ripe for partial summary disposition.

The statutory scheme in section 170 of Title 26 of the United States Code provides for a tax deduction for charitable contributions. "Charitable contribution" is defined in section 170(a) of Title 26 of the United States Code. 26 U.S.C. § 170(a) (1976 & Supp. V 1981). When a charitable contribution is in the form of a partial interest in property, a deduction will be denied pursuant to 26 U.S.C. § 170(f)(3)(A), unless it qualifies under one of three exceptions pursuant to 26 U.S.C. § 170(f)(3)(B), the last of which is a "qualified conservation contribution," 26 U.S.C. § 170(f)(3)(B)(iii). A qualified conservation contribution is defined as "a contribution ... of a qualified real property interest, ... to a qualified organization, exclusively for conservation purposes." 26 U.S.C. § 170(h)(1). The parties have stipulated, for the purposes of the instant partial motion for summary judgment, that the first two requirements have been met by the plaintiff in the instant case. The defendant, however, argues that the plaintiff has not made a contribution "exclusively for conservation purposes," pursuant to 26 U.S.C. § 170(h)(1)(C). The term "exclusively for conservation purposes," is defined in 26 U.S.C. § 170(h)(5), and requires that a contribution, exclusively for conservation purposes, be protected "in perpetuity," 26 U.S.C. § 170(h)(5)(A), and must contain a prohibition on the right to extract or remove minerals by any surface mining method, when a "qualified mineral interest" has been retained, 26 U.S.C. § 170(h)(5)(B). Furthermore, 26 U.S.C. § 170(h)(6) defines "qualified mineral interest" as "the right to access" "subsurface oil, gas, or other minerals."

Specifically, the language of 26 U.S.C. § 170 addresses charitable contributions and gifts. The introductory section, 26 U.S.C. § 170(a)(1), states:

(a) **Allowance of deduction**

(1) **General rule**

There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.

26 U.S.C. § 170(a)(1). Furthermore, 26 U.S.C. § 170(c)(1) defines "charitable contribution," in pertinent part, as follows:

### (c) Charitable contribution defined

For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

(1) A State, a possession of the United States, or any political subdivision of any of the foregoing, or the United States or the District of Columbia, but only if the contribution or gift is made for exclusively public purposes.

26 U.S.C. § 170(c)(1). Although 26 U.S.C. § 170(f)(3)(A) denies a charitable deduction when the underlying contribution is in the form of a partial interest in property, 26 U.S.C. § 170(f)(3)(B)(iii) provides an exception for contributions of partial interests in property when they qualify as a "qualified conservation contribution." The pertinent portions of 26 U.S.C. § 170(f)(3) state the following:

### (3) Denial of deduction in case of certain contributions of partial interests in property

#### (A) In general

In the case of a contribution (not made by a transfer in trust) of an interest in property which consists of less than the taxpayer's entire interest in such property, a deduction shall be allowed under this section only to the extent that the value of the interest contributed would be allowable as a deduction under this section if such interest had been transferred in trust. For purposes of this subparagraph, a contribution by a taxpayer of the right to use property shall be treated as a contribution of less than the taxpayer's entire interest in such property.

#### (B) Exceptions

Subparagraph (A) shall not apply to—

(i) a contribution of a remainder interest in a personal residence or farm.

(ii) a contribution of an undivided portion of the taxpayer's entire interest in property, and

(iii) a qualified conservation contribution.

26 U.S.C. § 170(f)(3).

The term "qualified conservation contribution" as used in section 170(f)(3)(B)(iii) is defined in 26 U.S.C. § 170(h):

### (h) Qualified conservation contribution

#### (1) In general

For purposes of subsection (f)(3)(B)(iii), the term "qualified conservation contribution" means a contribution—

(A) of a qualified real property interest

(B) to a qualified organization,

(C) exclusively for conservation purposes.

#### (2) Qualified real property interest

For purposes of this subsection, the term "qualified real property interest" means any of the following interests in real property:

(A) the entire interest of the donor other than a qualified mineral interest,

(B) a remainder interest, and

(C) a restriction (granted in perpetuity) on the use which may be made of the real property.

#### (3) Qualified organization

For purposes of paragraph (1), the term "qualified organization" means an organization which—

(A) is described in clause (v) or (vi) of subsection (b)(1)(A), or

(B) is described in section 501(c)(3) and—

(i) meets the requirements of section 509(a)(2), or

(ii) meets the requirements of section 509(a)(3) and is controlled by an organization described in subparagraph (A) or in clause (i) of this subparagraph.

#### (4) Conservation purpose defined

##### (A) In general

For purposes of this subsection, the term "conservation purpose" means—

(i) the preservation of land areas for outdoor recreation by, or the education of, the general public,

(ii) the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem,

(iii) the preservation of open space (including farmland and forest land) where such preservation is—

(I) for the scenic enjoyment of the general public, or

(II) pursuant to a clearly delineated Federal, State, or local governmental conservation policy,

and will yield a significant public benefit, or

(iv) the preservation of an historically important land area or a certified historic structure.

\* \* \*

**(5) Exclusively for conservation purposes**

For the purposes of this subsection—

**(A) Conservation purpose must be protected**

A contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity.

**(B) No surface mining permitted**

In the case of a contribution of any interest where there is a retention of a qualified mineral interest, subparagraph (A) shall not be treated as met if at any time there may be extraction or removal of minerals by any surface mining method.

**(6) Qualified mineral interest**

For purposes of this subsection, the term "qualified mineral interest" means—

(A) subsurface oil, gas, or other minerals, and

(B) the right to access to such minerals.

26 U.S.C. § 170(h).

Defendant concedes, solely for the purposes of its motion for partial summary judgment, that the plaintiff contributed qualified

real property interests to a qualified organization, pursuant to 26 U.S.C. § 170(h)(1)(A) and (B). Defendant argues, however, that the easements were not exclusively for conservation purposes pursuant to 26 U.S.C. §§ 170(c)(1) and 170(h)(1)(C), due to the plaintiff's alleged retention of the right to extract subsurface minerals such as sand and gravel, by surface mining methods, and, therefore, the deduction should be disallowed. Defendant argues that the right to surface mine subsurface minerals was retained by plaintiff because the plaintiff failed to grant perpetual conservation easements and also because the plaintiff failed to include language in either conservation easement which would prohibit the use of surface mining methods, as required by 26 U.S.C. § 170(h)(5). Defendant relies on the language of section 170(h)(5), to argue "that a contribution shall not be treated as 'exclusively for conservation purposes' if 'at any time there may be extraction or removal of minerals by any surface mining method.'"

The plaintiff disagrees with the defendant's position that the failure to preclude surface mining necessarily violates 26 U.S.C. § 170(h)(5), and, therefore, automatically disqualifies the plaintiff from taking a charitable contribution deduction for the conservation easements that it had granted to the State of Maine. The plaintiff argues that the defendant fails to take into account the full statutory and regulatory scheme of section 170(h)(5). According to the plaintiff, when section 170(h)(5) is read in its entirety, it does not bar a deduction in every case in which there is surface mining. The plaintiff argues that surface mining is prohibited only when there is a retention of a "qualified mineral interest," as defined in 26 U.S.C. § 170(h)(6). Plaintiff also does not dispute that it has conducted surface mining operations on the easement lands. At oral argument the following exchange occurred between the court and plaintiff's attorney:

THE COURT: But you are mining this by surface method?

MR. KLIEFOTH: I don't think there's any question that that's what's being done.[4]

4. In the joint stipulations, the parties also state: "[a]t least from 1986 through 1993, plaintiff, GP, and Bowater and their licensees, conducted sur-

face mining operations in approximately eight gravel pits located within the conservation easement lands."

Moreover, based on statements in plaintiff's response to the defendant's motion for partial summary judgment, plaintiff's statement of genuine issues, and the Resource Protection Plan itself, the plaintiff does not dispute that sand and gravel are minerals.

The dispositive issue, therefore, is not whether, or to what extent, surface mining of minerals is actually occurring, or that GNN retained the right to access minerals, specifically sand and gravel, by surface mining methods when it granted a conservation easement. In dispute is whether the sand and gravel on the easement lands at issue are surface, or subsurface, minerals. Plaintiff argues that the sand and gravel are surface minerals, that, therefore, no qualified mineral interest was retained by GNN, and accordingly that surface mining of the sand and gravel for construction materials is not prohibited. Moreover, GNN urges that it retained only limited rights to extract the sand and gravel. As a result, GNN argues it is entitled to receive a charitable contribution deduction for both conservation easements granted to the State of Maine.

In support of its opinion that sand and gravel are surface, not subsurface, minerals, the plaintiff attached to its appendix the declaration of an individual, who holds a bachelors and a masters degree in geography, and who had previously taught and consulted as a geologist and geographer. Plaintiff's declarant offered the opinion that "surface" or "surficial" deposits are "residual or transported materials overlying bedrock along the general interface between the atmosphere and the lithosphere." According to plaintiff's declarant, "[t]he sand and gravel deposits on the easement lands are found in esker and kame formations and are covered by only a very thin layer of soil." Therefore, the plaintiff argues that "the sand, gravel, and construction material deposits referred to in the easements are 'surface' or 'surficial' minerals," a qualified mineral interest was not retained by the plaintiff, and, therefore, the

prohibition on surface mining included in 26 U.S.C. § 170(h)(5) does not apply.

To emphasize defendant's opposition to plaintiff's argument, in its reply brief, the government states:

> According to plaintiff's argument, §§ 170(h)(5) and (6) should be interpreted as allowing a charitable contribution deduction to one who contributes a conservation easement to a charitable organization even if the donor . retains and exercises rights to excavate and thereby despoil the entire surface of the encumbered land in order to remove anything, indeed everything, above bedrock so long as the donor does not retain an interest in a mineral embedded in or below bedrock.

The defendant also offers definitions from Webster's Third New International Dictionary of the English Language Unabridged 2300 (1966) of "surface," "surficial," and "subsurface." According to the defendant, "surface" is properly defined as the exterior, outside, outermost, or uppermost portion of an object, whereas "subsurface" is defined as under or beneath the surface, including, for example, rocks or other earth material, which are near, but not exposed at the surface of the ground, and "surficial" is defined as "of or relating to a surface and esp. [sic] the earth's surface as—opposed to subterranean."

The term, "subsurface," is used in 26 U.S.C. § 170(h)(6) to define "qualified mineral interest" as the "right to access" "subsurface oil, gas, or other minerals...." The conflict between plaintiff and defendant regarding the statutory definition of surface and subsurface must be resolved in accordance with the accepted rules of statutory construction. Guidance has been offered by the United States Court of Appeals for the Federal Circuit, as follows:

> Statutory construction requires the application of recognized rules. See generally Sutherland Statutory Construction (4th ed.). First, ' " '[t]he starting point in every case involving construction of a statute is the language itself.' " ' Greyhound Corp.

*v. Mt. Hood Stages, Inc.,* 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978). Second, where a statute states what a term 'means' then all other meanings not stated are excluded. *Colautti v. Franklin,* 439 U.S. 379, 392 n. 10, 99 S.Ct. 675, 684, n. 10, 58 L.Ed.2d, 596 (1979). Third, clear evidence of legislative intent prevails over other principles of statutory construction. *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). Fourth, absent a very clear legislative intent, the plain meaning will prevail. *Aaron v. SEC,* 446 U.S. 680, 697, 100 S.Ct. 1945, 1956, 64 L.Ed.2d 611 (1980). Last, 'Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.' *Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978); *National Lead Co. v. United States,* 252 U.S. 140, 146–47, 40 S.Ct. 237, 239, 64 L.Ed. 496 (1920); *Farrell Lines, Inc. v. United States,* 499 F.2d 587, 605, 204 Ct.Cl. 482 (1974); *cf. Pierce v. Underwood,* [487] U.S. [552], 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988).

*Johns–Manville Corp. v. United States,* 855 F.2d 1556, 1559 (Fed.Cir.1988), *cert. denied,* 489 U.S. 1066, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989). Moreover, if a statute is plain and unequivocal on its face, there is no need to resort to the legislative history underlying the statute. *Reid v. Department of Commerce,* 793 F.2d 277, 281 (Fed.Cir.1986) (citing *United States v. Oregon,* 366 U.S. 643, 648, 81 S.Ct. 1278, 1280–81, 6 L.Ed.2d 575 (1961), *reh'g denied,* 368 U.S. 870, 82 S.Ct. 24, 7 L.Ed.2d 70 (1961)). A court should resort to legislative history only if:

... a literal interpretation would lead to an incongruous result. For example, if a literal reading of the statute would impute to Congress an irrational purpose, *United States v. Bryan,* 339 U.S. 323, 338, 70 S.Ct. 724, 734, 94 L.Ed. 884 (1950), or would thwart the obvious purpose of the statute, *Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978), or would lead to a result at variance with the policy of the legislation as a whole, *Trustees of Indiana University v. United States,* 618 F.2d 736, 739, 223 Ct.Cl. 88, 94 (1980), then literal interpretation will be eschewed in favor of resort to the legislative history to ascertain the intent of Congress. *United States v. Oregon,* 366 U.S. at 648, 81 S.Ct. at 1281, 2A Sands § 46.07.

*Reid v. Department of Commerce,* 793 F.2d at 281–82. Accepted principles of statutory construction also provide that courts must interpret a statute as a whole. *Beecham v. United States,* 511 U.S. 368, 372, 114 S.Ct. 1669, 1671–72, 128 L.Ed.2d 383 (1994) (citing *King v. St. Vincent's Hospital,* 502 U.S. 215, 221, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991); *Massachusetts v. Morash,* 490 U.S. 107, 115, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989)). To this effect, the Supreme Court has written:

On numerous occasions we have noted that ' " ' "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." ' " ' *Kelly v. Robinson,* 479 U.S. 36, 43 [107 S.Ct. 353, 357–58, 93 L.Ed.2d 216] (1986), quoting *Offshore Logistics, Inc. v. Tallentire,* 477 U.S. 207, 221 [106 S.Ct. 2485, 2493, 91 L.Ed.2d 174] (1986) (quoting *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 285 [76 S.Ct. 349, 359, 100 L.Ed. 309] (1956) (in turn quoting *United States v. Heirs of Boisdore,* 8 How. 113, 122 [12 L.Ed. 1009] (1849))).

*Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 51, 107 S.Ct. 1549, 1555, 95 L.Ed.2d 39 (1987); *see* Sutherland Stat. Const. §§ 46.05, 46.06 (5th ed.1992). Otherwise stated, courts must " 'give effect, if possible, to every clause and word of a statute,' " *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955) (quoting *Inhabitants of the Township of Montclair v. Ramsdell,* 107 U.S. 147, 152, 2 S.Ct. 391, 395, 27 L.Ed. 431 (1883)), for " '[t]he cardinal principle of statutory construction is to save and not to destroy,' " *id.* (quoting *N.L.R.B. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893 (1937)).

In construing a statute, courts should attempt not to interpret a provision such that it renders other provisions of the same statute inconsistent, meaningless, or superfluous. *Boise Cascade Corp. v. United States E.P.A.*, 942 F.2d 1427, 1432 (9th Cir. 1991); *see* Sutherland Stat. Const. § 46.06 (5th ed.1992). The meaning of statutory language depends on context, and a statute should be read as a whole. *Bailey v. United States,* —— U.S. ——, ——, 116 S.Ct. 501, 506, 133 L.Ed.2d 472 (1995); *King v. Saint Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991) (Souter, J.) (citing *Shell Oil Co. v. Iowa Dept. of Revenue,* 488 U.S. 19, 26, 109 S.Ct. 278, 282, 102 L.Ed.2d 186 (1988)). As stated in *King v. Saint Vincent's Hospital,* "[w]ords are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used." *King v. Saint Vincent's Hosp.,* 502 U.S. at 221, 112 S.Ct. at 574 (quoting *N.L.R.B. v. Federbush Co.,* 121 F.2d 954, 957 (2nd Cir. 1941) (L. Hand, J.)). Therefore, when reviewing the statute at issue in this case, this court must construe each part of a statute in connection with all the other sections, so as to produce a harmonious whole. ·

Moreover, when reviewing an agency's construction of a statute it administers, courts have shown great deference to the interpretation of the statute given by that agency. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694, *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 29, 82 L.Ed.2d 921 (1984); *Katsis v. Immigration & Naturalization Service,* 997 F.2d 1067, 1069 (3rd Cir.1993), *cert. denied,* 510 U.S. 1081, 114 S.Ct. 902, 127 L.Ed.2d 93 (1994); *see also Wassenaar v. Office of Personnel Management,* 21 F.3d 1090, 1092 (Fed.Cir.1994). "[T]he courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program." *Katsis,* 997 F.2d at 1070 (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 448, 107 S.Ct. 1207, 1221–22, 94 L.Ed.2d 434 (1987)).

In the instant case, there is no definition of the term "subsurface" in the applicable statute, the legislative history of the statute, or the implementing regulations. *See* Pub.L. No. 96–541, 94 Stat. 3204 (codified as amended at 26 U.S.C. § 170 (1976 & Supp. V 1981)); S.Rep. No. 96–1007, 96th Cong., 2d Sess. 13 (1980) U.S.Code Cong. & Admin.News 1980 pp. 6736, 6748, *reprinted in* 1980–2 C.B. 599, 605; 26 C.F.R. § 1.170A–14. Nor does there appear to be case law which discusses a distinction between surface and subsurface with regard to the provisions of 26 U.S.C. § 170. When a word in a statute has not been defined by Congress, the statutory term should be construed in accordance with its ordinary or natural meaning. *FDIC v. Meyer,* 510 U.S. 471, 476, 114 S.Ct. 996, 1000–01, 127 L.Ed.2d 308 (1994); *Smith v. United States,* 508 U.S. 223, 228, 113 S.Ct. 2050, 2053–54, 124 L.Ed.2d 138, *reh'g denied,* 509 U.S. 940, 114 S.Ct. 13, 125 L.Ed.2d 765 (1993).

Because 26 U.S.C. § 170(h)(5) and (6) are part of a statutory scheme designed to promote conservation, it would be incongruous with the purposes of the statute to adopt a definition of "subsurface" which would allow disruption of the landscape by surface, or strip mining, to access gravel and sand. Furthermore, under the common and generally accepted definitions of the words "surface" and "subsurface" discussed above, the minerals at issue should be defined as subsurface minerals since they are not exposed to the atmosphere, and have soil or some other type of covering. Even plaintiff's own professor described the sand and gravel as covered by a layer of soil.

The retention of interests by the plaintiff in the above-captioned case is set forth in the Resource Protection Plan and the conservation easements. The Resource Protection Plan does not prohibit, but rather allows, surface mining on the properties at issue. The Resource Protection Plan permits the plaintiff to extract minerals affecting an area of less than three acres in size for road construction purposes. The Resource Protection Plan also permits the plaintiff to extract minerals from an area of three acres or more in size, upon the issuance of a permit

from the Land Use Regulation Commission. Furthermore, the Resource Protection Plan is an agreement between the state and the plaintiff, which is of limited duration.

As for the conservation easements, they state: "[t]he Grantor [plaintiff] reserves all its right in and to and uses of Easement Lands not inconsistent with the rights, covenants and restrictions set forth herein including the right to harvest timber and extract minerals." Furthermore, the 3200 acre easement states that the plaintiff grantor retains the "right to locate borrow pits and excavate therefrom material necessary for construction" of hydroelectric and associated facilities on the land. Moreover, the conservation easements specifically permit the extraction of gravel from the land to be used in the construction and maintenance of roads, and the plaintiff acknowledges that it has engaged in surface mining on the easement properties. Therefore, in order not to negate the legislative intent of the statute and to avoid undermining the policy which the charitable deduction for conservation purposes was sought to promote, the court finds that the plaintiff has retained the right to mine subsurface minerals by surface mining methods, within the meaning of 26 U.S.C. § 170(h)(5) and (6). Consequently, the plaintiff has retained a qualified mineral interest pursuant to 26 U.S.C. § 170(h)(6), and plaintiff's contribution is not exclusively for conservation purposes, pursuant to 26 U.S.C. § 170(h)(5)(A). As a result, the plaintiff is not entitled to the charitable contribution it claims before this court.

Plaintiff in the above-captioned case also appears to argue that the applicable regulatory scheme allows a charitable deduction to a donor of a conservation easement, who surface mines the property encumbered by the easement, as long as the impact on the real property is "localized" and is not "irremediably destructive" of the conservation easement. In its opposition to defendant's motion for partial summary judgment, plaintiff states:

> The Regulation [I.R.C. § 170A–14g(4)(i) ], provides that a deduction will not be denied where the mining has limited, localized impact and is not irremediably

destructive of significant conservation interests. Again, as discussed in Part D, in view of the restrictions in the Easements and the Resource Protection Plan, GNN has submitted proposed findings of uncontroverted facts that satisfy the regulatory exception.

Treasury Regulation § 1.170A–14(g)(4) states in pertinent part:

> (4) *Retention of qualified mineral interest*—(i) *In general.* Except as otherwise provided in paragraph (g)(4)(ii) of this section, the requirements of this section are not met and no deduction shall be allowed in the case of a contribution of any interest when there is a retention by any person of qualified mineral interest (as defined in paragraph (b)(1)(i) of this section) if at any time there may be extractions or removal of minerals by any surface mining method. Moreover, in the case of a qualified mineral interest gift, the requirement that the conservation purposes be protected in perpetuity is not satisfied if any method of mining that is inconsistent with the particular conservation purposes of a contribution is permitted at any time. *See also* § 1.170A–14(e)(2). However, a deduction under this section will not be denied in the case of certain methods of mining that may have limited, localized impact on the real property but that are not irremediably destructive of significant conservation interests. For example, a deduction will not be denied in a case where production facilities are concealed or compatible with existing topography and landscape and when surface alteration is to be restored to its original [sic] state.

Treas. Reg. § 1.170A–14(g)(4); 1986–1 C.B. 88, 98.

It is true that regulations of the Treasury Department:

command our respect, for Congress has delegated to the Secretary of the Treasury, not to this Court, the task 'of administering the tax laws of the Nation.' *United States v. Cartwright,* 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973); accord, *United States v. Correll,* 389 U.S. 299, 307, 88 S.Ct. 445, 450, 19 L.Ed.2d 537 (1967); see 26 U.S.C. § 7805(a). We

therefore must defer to Treasury Regulations that 'implement the congressional mandate in some reasonable manner.' *United States v. Correll, supra,* at 307, 88 S.Ct., at 450; *accord, National Muffler Dealers Assn. v. United States,* 440 U.S. 472, 476–77, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979). To put the same principle conversely, Treasury Regulations 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.' *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948); *accord, Fulman v. United States,* 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1 (1978); *Bingler v. Johnson,* 394 U.S. 741, 749–751, 89 S.Ct. 1439, 1444–45, 22 L.Ed.2d 695 (1969). *Commissioner v. Portland Cement Co. of Utah,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981).

Furthermore, Senate Report No. 96–1007, 96th Cong. 2d Sess. 13 (1980) U.S.Code Cong. & Admin.News pp. 6736, 6749, to Public Law 96–541 specifically prohibits surface mining, due to its more wide-spread destructive nature and states the following:

> In the case of a qualified mineral interest gift, the requirement that the conservation purpose be protected in perpetuity is not satisfied if any method of mining, removal, or extraction that is inconsistent with the particular conservation purposes of a contribution is permitted at any time. Some methods of mining, removal, or extraction may have temporary, localized impact on the real property contributed that is not destructive of significant conservation interest, and this requirement may be satisfied even though such methods are permitted. In addition, the bill specifically states that this requirement is not met if at any time the minerals may be removed or extracted by any surface mining method.

Senate Report No. 96–1007, 96th Cong., 2d Sess. 13 (1980), *reprinted in* 1980–2 C.B. 599, 605.

■ Plaintiff's interpretation of the above-quoted Treasury Regulation, which is based on only a portion of the regulation, would allow surface mining to occur as long as the surface mining meets the criteria in the third sentence of Treasury Regulation § 1.170A–14(g)(4). Application of the plaintiff's interpretation, however, would conflict with and subvert the fundamental conservation purposes of the statute. Plaintiff's interpretation also would be contrary to the specific prohibition in 26 U.S.C. § 170(h)(5)(B), against surface mining when a qualified mineral interest is retained and would conflict with the plain language of the first sentence of the Treasury Regulation. Therefore, the language included in Treasury Regulation § 1.170A–14(g)(4), which allows "certain methods of mining that may have limited localized impact on the real property, but that are not irremediably destructive of significant conservation interests," (language which also appears in the legislative history to the applicable statute, 26 U.S.C. § 170(h)(5)), should not be interpreted to permit even localized surface mining of qualified mineral interests, whether or not the production facilities can be concealed, are compatible with existing topography, or even if it is possible to restore the lands to their original state.

■ Defendant further argues in its reply brief that plaintiff's charitable contribution deduction also should be denied because plaintiff's grant of a conservation easement was not in "perpetuity" and, therefore, the plaintiff is not entitled to a qualified conservation contribution deduction. Defendant refers to 26 U.S.C. § 170(h)(2)(C) and § 170(h)(5)(A), which require that when the basis of a qualified conservation contribution is a restriction on the use of real property, the restriction must be granted "in perpetuity." In referring to the definition of "conservation purpose" in 26 U.S.C. § 170(h)(4)(A), the Senate Report specifically stated: "The bill retains the present law requirement that contributions be made 'exclusively for conservation purposes.' Moreover, the bill explicitly provides that this requirement is not satisfied unless the conservation purpose is protected in perpetuity." S.Rep. No. 96–1007, 96th Cong. 2d Sess. 13 (1980) U.S.Code Cong. & Admin.News pp. 6736, 6749, *reprinted in* 1980–2 C.B. 599, 605. As indicated above, the Senate Report stated: "In the case of a qualified mineral inter-

est gift, the requirement that the conservation purpose be protected in perpetuity is not satisfied if any method of mining, removal, or extraction that is inconsistent with the particular conservation purposes of a contribution is permitted at any time." S.Rep. No. 96–1007, 96th Cong. 2d Sess. 13 (1980) U.S.Code Cong. & Admin.News pp. 6736, 6749.

The defendant acknowledges that the language used in the easements in question included grants in perpetuity. The defendant, however, relies on, and the plaintiff concedes, that the limitations on the plaintiff's right to extract minerals are imposed by the Resource Protection Plan and not by the conservation easements. The State of Maine accepted and imposed the Resource Protection Plan for a period of twenty (20) years from the date of commission approval. Therefore, the defendant argues that the restrictions on plaintiff's right to extract minerals from easement lands are not restrictions in perpetuity. Defendant asserts that the current restrictions on plaintiff's rights to access and extract minerals within the easement lands "could be made less stringent or eliminated altogether whenever plaintiff and the State might agree or, without any agreement, at the end of the 20–year period."

Although the conservation easements place some restrictions on the grantor, GNN, regarding the use of the subject lands, as quoted more fully above in the common language of the easements, GNN clearly retains the right to extract minerals, including gravel, from the easement lands. Specifically, the easements provide:

> Also excepting and reserving from said Easement the right to construct and maintain roads (including the extraction from the Easement Lands of gravel to be used in such construction and maintenance)....

The easements also state that, "[t]he Grantor reserves all its rights in and to and uses of Easement Lands not inconsistent with the rights, covenants and restrictions set forth herein including the right to harvest timber and extract minerals." Furthermore, the 3200 acre easement even more clearly states that the grantor retains the "right to locate borrow pits and excavate therefrom material necessary for construction" of hydroelectric

and associated facilities on the land. Therefore, the language of the conservation easements not only fails to restrict the plaintiff from conducting surface mining operations on the easement lands, but, rather, explicitly grants the right to the plaintiff to excavate and to conduct mining for minerals, such as sand and gravel.

The Resource Protection Plan explicitly sets out the limited duration of the plan, as follows:

### Section VII DURATION OF PLAN

The Resource Protection Plan will be in force for a period of 20 years from the date of Commission approval so long as the LURC law, or any amended or replacement version thereof, remains in effect. Since the Conservation Easements are perpetual, a long term Resource Protection Plan is feasible. At the end of the 20 year period, Great Northern may seek to renew the Plan.

Although the plaintiff claims that the restrictions set forth in the Plan sufficiently restricts its ability to surface mine, this court finds that the limited duration of the plan belies plaintiff's claims that it has surrendered a perpetual conservation easement, as required by the statute and the Treasury Regulations, and as necessary to qualify for a charitable conservation contribution deduction.

### CONCLUSION

After careful review of the record before this court and the applicable law, the court concludes that the defendant has met its burden of proof on its motion for partial summary judgment. For the reasons set forth above, the plaintiff has failed to convince this court that 26 U.S.C. § 170 should be interpreted to allow a charitable contribution deduction for the alleged conservation easements because the plaintiff has retained a qualified mineral interest and has retained the right to strip or surface mine subsurface minerals on the 8,000 acres of land in Northern Maine covered by the two conservation easements. Finally, the plaintiff has failed to persuade the court that the restrictions on the plaintiff

or its successors regarding surface mining activities were granted in perpetuity, as is required in order to qualify for a charitable contribution deduction. Therefore, this court, hereby, **GRANTS** the defendant's motion for partial summary judgment.

**IT IS SO ORDERED.**